**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| JAY HOUSTON, on Behalf of Himself and All Others Similarly Situated,<br><br>      Plaintiff,<br>  v.<br><br>PAPA JOHN'S INTERNATIONAL, INC., a Delaware Corporation; and PAPA JOHN'S USA, INC., a Kentucky Corporation,<br><br>      Defendants. | Case No.:   3:18-CV-825-JHM<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, Jay Houston, on behalf of himself and all others similarly situated, with knowledge as to his own actions and events, and upon information and belief as to other matters, alleges as follows:

## NATURE OF THE ACTION

1. In its Code of Ethics and Business Conduct, Papa John's International, Inc. asserts that it "complies with all applicable labor and employment laws and regulations," and acknowledges that "[a]ntitrust laws prohibit agreements among companies that fix prices, divide markets, limit production or otherwise interfere with the free marketplace."[1]  This action challenges under Section 1 of the Sherman Act, 15 U.S.C. §1, just such an agreement.  For years, Defendants Papa John's International, Inc. and Papa John's USA, Inc. (together, "Defendants" or

---

[1] *See* Papa John's International, Inc. Code of Ethics and Business Conduct (July 2018, hereafter "Code of Ethics") at 8, https://ir.papajohns.com/static-files/2f3a19d7-4de1-4dd3-b0fc-8cb32ffd13b1 (last visited Nov. 1, 2018).

"Papa John's") orchestrated an employee no-poach and no-hiring agreement between and among Papa John's restaurant franchisees, pursuant to which the franchisees agreed not to solicit, poach, or hire each other's employees or Papa John's employees.  Papa John's orchestrated, designed, dispersed, and enforced the policy among all franchisees, at least in part, through explicit contractual agreements (and remedies for violation) in standard franchise documents.  The practice at issue reflects a naked restraint of competition and a *per se* violation of the antitrust laws.

2.      Papa John's is the fourth largest pizza company in the world with over 5,000 restaurants worldwide.[2]  More than 85% of Papa John's restaurants worldwide are franchise businesses that are independently owned and operated, and are separate and distinct entities from Papa John's.[3]

3.      Papa John's has franchise restaurants in all 50 U.S. states (plus the District of Columbia) and in multiple international markets.

4.      As of 2017, approximately 2,739 of the 3,442 Papa John's U.S. restaurants (roughly 80%) were franchise restaurants.  Franchise restaurants are independently owned and operated by franchisees who have executed a standard form franchise agreement with Papa John's. Franchisees are separate and distinct legal entities from Papa John's.

5.      Plaintiff and the Class are current and former employees of Papa John's restaurants. Plaintiff and the Class suffered reduced wages and benefits and diminished employment opportunities as a result of the unlawful contract, combination, or conspiracy alleged herein.

6.      Papa John's boasts on its website "People Are Priority Always.  Our success

---

[2]      *See* https://ir.papajohns.com/investor-faqs (last visited Nov. 1, 2018).

[3]      *See*  https://www.entrepreneur.com/franchises/papajohnsintlinc/282662,  ENTREPRENEUR (last visited Nov. 1, 2018).

depends upon our ability, as a team, to work together to achieve our goals and expectations."[4]
Papa John's also claims "Our attitude is a reflection of what we value:  successful team members
must be upbeat, proactive and passionate about everything they do."[5]

7.     But as part of the system that has made Papa John's one of the largest pizza
businesses in the world, Papa John's franchisees, at the direction of and with the assistance of Papa
John's itself, have together colluded to suppress the wages and employment opportunities of the
restaurant-based employees who work at Papa John's restaurant locations throughout the United
States.

8.     In particular, Papa John's and its franchisees have contracted, combined, and/or
conspired to not solicit, poach, or hire each other's employees.  This agreement was evidenced by
franchisees' written pledge in their standardized franchise agreements.   They agreed to the
following:

> You covenant that you will not, during the Term and for a period of one year after
> expiration or termination of the Franchise, employ or seek to employ any person
> who is employed by us, our Affiliates or by any of our franchisees, or otherwise
> directly or indirectly solicit, entice or induce any such person to leave their
> employment.[6]

Every franchisee executing a franchise agreement until at least November 2017 made this same
agreement.

9.     Each franchisee also agreed to onerous remedies for any violation of the no-poach
and no-hire agreement.  In "addition to all other remedies," franchisees agreed that Papa John's is

---

[4]     *See* https://www.papajohns.com/company/index.html (last visited Nov. 1, 2018).

[5]     *See* https://www.papajohns.com/company/ (last visited Nov. 1, 2018).

[6]     Papa John's International, Inc., 2017 Standard Restaurant Franchise Agreement (hereafter,
"FA"), ¶16(e).

entitled to injunctive relief and specific performance in the event of breach, and that  Papa John's may terminate – without opportunity to cure – the franchise of a franchisee who violates the no-poach provision.[7]  Franchisees further agreed that Papa John's would be entitled upon termination to "all damages, costs and expenses, including reasonable attorneys' fees" incurred in obtaining injunctive or other relief for the enforcement of any provision of the franchise agreement.[8] Franchisees also agreed to additional post-termination provisions, as more fully discussed below.

10.     The Papa John's no-poach and no-hire agreement is an unreasonable restraint of trade.

11.     As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."[9]  The DOJ/FTC *Guidance* elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services.  It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[10]

12.     The no-poach and no-hire agreement between and among Papa John's and its franchisees has eliminated franchisees' incentives and ability to compete for employees and has restricted employees' mobility.  This agreement has harmed employees by lowering salaries and

---

[7]      *Id.*, ¶16(h).

[8]      *Id.*, ¶20(a)(vii).

[9]      https://www.justice.gov/atr/file/903511/download (last visited Nov. 1, 2018).

[10]      *Id.*

benefits employees otherwise would have commanded in a competitive marketplace and has deprived employees of better job growth opportunities.

13.     The no-poach and no-hire agreement had and has the purpose of restricting competition for labor and had and has the intended and actual effect of fixing and suppressing compensation and restricting employment mobility.  The no-poaching agreement between and among Papa John's and its franchisees is a naked restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. §1.  As the orchestrator of the unlawful agreement, Papa John's bears *per se* liability therefor.

## THE PARTIES

*Plaintiff*

14.     Plaintiff, Jay Houston, is a resident of Fort Collins, Colorado.  He is currently employed by NOCO Pizza, Inc, a Papa John's franchisee that owns and operates the Papa John's store located at 1275 East Magnolia, in Fort Collins, Colorado.  Houston is employed by NOCO Pizza, Inc. as a Prep Cook and Driver.

*Defendants*

15.     Defendant, Papa John's International, Inc., is a Delaware corporation with its principal place of business at 2002 Papa John's Boulevard, Louisville, Kentucky 40269-0900. Papa John's International, Inc., is the franchisor of Papa John's brand franchise restaurants in the United States.  Papa John's International, Inc., also owns a majority interest in a number of Papa John's franchisee restaurants.

16.     Defendant, Papa John's USA, Inc., is a Kentucky corporation with its principal place of business at 2002 Papa John's Boulevard, Louisville, Kentucky 40269-0900.  Papa John's

5

USA, Inc. is a wholly-owned subsidiary of Papa John's International, Inc.  Among other functions, it owns and operates Papa John's restaurants in the United States.

17.    Papa John's is in the business of selling food to customers primarily through independently owned and operated franchise restaurants.  Papa John's has multiple franchise restaurants in virtually every U.S. state and the District of Columbia.  It owns and operates company-owned restaurants in approximately 25 U.S. states.

*Co-Conspirators*

18.    Various other corporations and persons not named as defendants in this Complaint, including Papa John's franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

## JURISDICTION AND VENUE

19.    This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1 and to enjoin further violations.  The Court has subject matter jurisdiction under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, under Section 4 of the Sherman Act, 15 U.S.C. §4, and under 28 U.S.C. §§1331, 1332(d), and 1337 to prevent and restrain the Defendants from violating Section 1 of the Sherman Act, 15 U.S.C. §1.

20.    Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and under 28 U.S.C. §1391(b)(2), (c)(2).  Papa John's transacts or has transacted business in this district.  A substantial part of the events that gave rise to this action occurred in this district, including the participation in the conspiracy by and between Papa John's corporate headquarters and Papa John's franchisees located throughout the United States..

21.     Papa John's brand franchise restaurants are in each state in the United States.  Papa John's has substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise.  Papa John's engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## FACTUAL ALLEGATIONS

22.     Papa John's franchisees and company-owned restaurants compete with each other. In a properly functioning and lawfully competitive labor market, Papa John's franchisees and company-owned restaurants would openly compete for labor, by soliciting current employees of one or more other franchisees (*i.e.*, attempting to "solicit," "entice," or "induce" other franchisees' employees).  A properly functioning market would involve "cold calling": the practice by which a prospective employer freely communicates with prospective employees – even if the employee does not first express interest.

23.     For instance, if Franchise A believes that a certain employee performs his or her job well at Franchise B, then Franchise A would be free to contact that employee about an employment opportunity.  Conversely, if an employee of Franchise B perceives Franchise A to be a better organization – whether because of increased wages, better benefits, or otherwise – then the employee would be free to communicate with Franchise A about potential employment.

24.     Poaching and cold-calling are thus important aspects of a lawfully competitive labor market.  Companies perceive other rival companies' current employees, especially those who are not actively seeking other employment, in a more favorable way.  This is true at least in part because companies value satisfied employees who are good at their jobs, leading them to perceive a rival company's current employees as more qualified, harder working, and more stable than those

candidates who are unemployed or who are actively seeking employment. Thus, a company seeking to hire a new employee will lessen the risks associated with that hire by seeking to hire a rival's employee. The Papa John's no-poach and no-hire agreement inhibits such lateral hiring of current employees because Franchise A cannot solicit or hire Franchise B's current employee. Cold-calling and poaching are thus useful and key competitive tools for companies seeking to recruit employees, particularly employees with unique skills.

25. No-poaching agreements significantly impact employee compensation. For example, an employee of Franchise B will lack information regarding Franchise A's pay packages unless cold calling and open communications are permitted; without such information, the employee lacks leverage when negotiating with Franchise B. Similarly, unconstrained by a no-poaching agreement, if an employee of Franchise B receives an offer of higher compensation from Franchise A, the employee can either accept Franchise A's offer or attempt to negotiate a pay increase with Franchise B. Either way, the employee's compensation increases.

26. An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees. These Franchise B employees can then also use that information to negotiate pay increases or move to another employer – even if they do not receive a cold call.

27. Increased mobility combined with increased information and transparency regarding compensation levels tends to increase compensation across all current employees in the labor market. After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain skilled labor. Further, the possibility of losing talent to a rival means companies will take steps to reduce the risks of poaching by assuring that employees are not undercompensated.

28.     In a properly functioning and lawfully competitive labor market, Papa John's franchisees and company-owned restaurants would also openly compete for labor by hiring those qualified employees of competing Papa John's restaurants who seek out employment with other franchises.

29.     The beneficial effects of competition (and beneficial effects on compensation) are not, however, limited to those particular individuals who receive cold calls or who wish to speak to a rival company about an employment opportunity.   The effects instead impact all similarly situated employees because of the effect on information flow and on competition for labor.

30.     For all these reasons, the principle of free competition applies to the labor market as well as to trade.   "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

31.     According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees."   Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

32.     The collusion of employers to refrain from hiring each other's employees restricts employee mobility.   This raises employers' power in the market at the expense of employees and diminishes employee bargaining power.   This is especially harmful to employees of Papa John's

restaurants as those employees are frequently paid below a living wage,[11] and the marketable skills they acquire through their work at Papa John's restaurants primarily have value only to other Papa John's restaurants and do not transfer to other fast food restaurants or similar businesses.   In addition, widespread use of no-poach agreements within the franchise industry at large effectively reduces the number of competitive employers in a market to no more than the number of franchise companies.   No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

33.    Although unemployment in the United States is currently very low, wage growth has been slow.  A decade removed from the Great Recession, wage growth has remained stuck below 3%.[12]   A growing number of commentators have identified proliferating employer no-poaching agreements – including those used within franchise systems – and dubious employee non-compete agreements as significant contributors to this stagnant wage growth.[13]

34.    The United States DOJ has pursued and resolved civil antitrust investigations relating to no-poach agreements made between or among employers.  In 2010, DOJ settlements

---

[11]    In 2014, the average hourly wage of fast food employees is $9.09 or less than $19,000 per year for a full-time worker.  The poverty level of a family of four in the U.S. is $23,850.  Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack,* CNN MONEY (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited Nov. 1, 2018).

[12]    *See* Jana Kasperkevic and Kimberly Adams, *Here is the Truth About Wages that You Won't Hear from Trump*, MARKETPLACE (Feb. 2, 2018), https://www.marketplace.org/2018/02/02/ economy/here-truth-about-wages-you-won-t-hear-trump (last visited Nov. 1, 2018).

[13]    *See*, *e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger Joint Clause Offers a Clue*, NEW YORK TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html; Alan B. Krueger and Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, NEW YORK TIMES (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html    (last visited Nov. 1, 2018).

with six high-tech employers prohibited those companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis.

35.     As noted above, the 2016 DOJ/FTC *Antitrust Guidance for Human Resource Professionals* states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."

36.     On November 21, 2017, United States Senators Cory Booker and Elizabeth Warren wrote to then-Attorney General Jeff Sessions, asking the AG to respond to questions about DOJ's approach to addressing the anti-competitive effects of proliferating no-poach agreements in the franchise context in particular.

37.     In January 2018, and at several speaking events since that time, DOJ Antitrust Chief and Assistant Attorney General Makan Delrahim disclosed that the DOJ Antitrust Division is presently pursuing a number of ***criminal*** cases relating to employer no-hire agreements.  As noted above, DOJ treats such agreements as *per se* unlawful under Section 1 of the Sherman Act.

38.     In April 2018, the DOJ announced that it had resolved an investigation into a no-poach agreement among firms in the rail industry, which – like the other matters discussed above – it labeled as *per se* unlawful.

39.     In July 2018, Attorneys General from 11 states announced an investigation into no-poaching hiring practices at a number of fast food franchise chains.  According to a release from Illinois Attorney General Lisa Madigan, the state is investigating no-poach agreements because those agreements "unfairly stop[] low-income workers from advancing and depress[] their wages."  The state AGs demanded documents and information from franchisors about their no-poach practices.

40.      In July 2018, Washington Attorney General Bob Ferguson announced that in order to avoid lawsuits, seven franchisors had reached agreements to discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from franchise agreements going forward.  Papa John's was not among these franchisors.

41.      In August 2018, Attorney General Ferguson announced that in order to avoid lawsuits, eight *additional* restaurant chain franchisors had agreed to discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from franchise agreements going forward.  Papa John's was, again, not among these franchisors.

42.      In September 2018, Papa John's, too, finally entered into an Assurance of Discontinuance with the Washington AG relating to the no-poach and no-hire agreement evidenced in its pre-November 2017 franchise agreements.   AG Ferguson announced on September 13, 2018, that among eight additional restaurant chain franchisors (bringing the total to 23), Papa John's had agreed to discontinue enforcement of no-poach provisions and to take steps to remove no-poach language from certain franchise agreements going forward.  In particular, Papa John's agreed that it would, *inter alia*, (i) not include the no-solicit and no-hire provision in any of its future franchise agreements; (ii) not enforce the no-solicit and no-hire provision in any of its existing franchise agreements, and "will not seek to intervene or defend in any way the legality of any no-poach provision in any litigation in which a franchisee may claim third-party beneficiary status rights to enforce an existing no-poaching provision;" (iii) notify all of its Washington franchisees of its agreement with the Washington AG; and (iv) take steps to amend existing franchise agreements *with entities in Washington* to remove any no-poaching provisions in existing franchise agreements.  The Assurance of Discontinuance notes that if any Washington franchise owner is unwilling to consent to the change to its franchise agreement, or demands other

material changes which are unacceptable to Papa John's, then Papa John's will provide the name and address of the "resisting franchisee" to the Washington AG.

43.     According to the Assurance of Discontinuance, Papa John's had, in November 2017, "elected to remove the 'no-poaching provision' from its standard franchise agreements nationwide on a going forward basis."  Such a prospective change, if it was made at that time, still kept in place franchise agreements containing the 'no-poaching provision' governing thousands of restaurants around the United States.  Papa John's made no assurance that it would attempt to remove the provisions from non-Washington franchise agreements.  Papa John's also made no assurance that it would notify non-Washington franchisees of its agreement with the Washington AG.  Finally, no action taken by AG Ferguson or by Papa John's resolves any civil liability to restaurant employees – within Washington or in any other state.

***The Papa John's System***

44.     Founded in 1984, Papa John's is today one of the world's largest restaurant chains, with more than 5,000 restaurants worldwide, serving customers daily in more than 44 countries.[14] Papa John's primarily sells pizza, though its menu includes wings, sides, drinks, and desserts.

45.     Papa John's restaurants are owned and operated either by Papa John's itself (or its predecessor or affiliates), or by franchisees.  Papa John's revenues come from the rent, royalties (currently 5% of gross sales), and franchise fees paid by franchisees, as well as from sales in its company-operated restaurants.

---

[14]     Papa John's Form 10-K Annual Report for the fiscal year ending December 31, 2017 (hereafter "Annual Report") at 3, available at https://www.sec.gov/Archives/edgar/data/901491/ 000155837018001176/0001558370-18-001176-index.htm (last visited Nov. 1, 2018).

46.     As of 2017, approximately 2,739 of the 3,441 Papa John's U.S. restaurants (roughly 80%) were franchisee-owned and operated.[15]

47.     Traditional Papa John's franchise restaurants are typically located on or near main thoroughfares.  Each franchisee is responsible for locating an appropriate restaurant site, which must be approved by Papa John's.  The franchise is required to operate the restaurant at the specific site that Papa John's approves, and may not relocate without Papa John's approval.

48.     Most of the company's franchisees are subject to a standard 10-year franchise license agreement.  The initial Papa John's franchise fee is currently $25,000.  In its 2017 Franchise Disclosure Document ("FDD"), Papa John's estimated that the total investment necessary to begin operation of a Papa John's franchise restaurant ranges from $130,120 to $844,420.

49.     Each franchise is operated by an independently owned and managed business, by an entity that is a separate legal entity from Papa John's.  Papa John's licenses to franchisees the right to use the Papa John's brand and system in the operation of these independently owned franchise restaurants.  In addition to franchise fees and royalties, franchisees also pay other advertising and marketing fund contributions.

50.     Like other fast food chains in the industry, Papa John's restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

***Papa John's Franchisees: Independent Restaurant Owners Competing with One Another***

51.     Each franchise is operated by an entity that is a separate legal entity from Papa John's.  Each franchise is an independently owned and independently managed business.

---

[15]     *Id.* at 6.

52.     In executing the Papa John's franchise agreement, a franchisee specifically agrees that neither it nor Papa John's will be "an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever."[16]  Franchisees agree that there is no fiduciary relationship between the parties and that franchisees are and will remain "independent contractor[s]."[17]

53.     A franchisee agrees to "hold [itself] out to the public as an independent contractor, separate and apart from [Papa John's]."[18]  Franchisees also agree to identify themselves, in places conspicuous to the public and to employees, as "an independently owned and operated franchise."[19]  Franchisees must identify themselves as the owners of franchise in conjunction with any use of the Papa John's proprietary marks, including on checks, invoices, receipts, letterhead, contracts, and all employment-related documents.[20]

54.     Franchisees are responsible for day-to-day operations, including employment matters.[21]  The Papa John's franchise agreement itself specifies that franchisees "have full responsibility for the conduct and terms of employment for [the franchisees'] employees and the day-to-day operation of [the franchisees'] business, including hiring, termination, pay practices and any other employment practices."[22]

---

[16]     FA, ¶21.

[17]     *Id.*

[18]     *Id.*

[19]     FA, ¶7(d).

[20]     *Id.*

[21]     Annual Report at 14.

[22]     FA, ¶11(c).

55.     The Papa John's franchise agreement elsewhere specifies that Papa John's "will have no responsibility for the day-to-day operations of the Restaurant or the management of your business, . . . [and] no responsibility for or control or supervision of your employees or your employment practices."[23]

56.     Papa John's franchisees and restaurants compete with each other.  In its Franchise Disclosure Document, Papa John's discloses to prospective franchisees "you may face competition from other Papa John's franchisees, from restaurants that we own, or from other channels of distribution or competitive brands that we control."[24]

57.     The traditional franchise is for a single restaurant at a specified location.  The franchisee is allowed a one-and-one-half mile radius around the location (or a one-half mile radius in certain densely populated urban areas) within which Papa John's will not locate, or license another to locate, a Papa John's restaurant.  Papa John's may, however, open or franchise the right to open "non-traditional" location restaurants within that area, such as within shopping malls, hospitals, airports, or sports arenas.  Papa John's tells franchisees – and they acknowledge in executing the franchise agreement – that franchisees "will compete with other Papa John's restaurants, that are now, or that may in the future be, located near or adjacent to your Territory."[25]  Papa John's informs franchisees (and they acknowledge) that other Papa John's restaurants may

---

[23]     FA, ¶21(b).

[24]     Papa John's International 2017 Franchise Disclosure Document (hereafter, "FDD"), Item 12.

[25]     FA, ¶5(a).

solicit or make sales within the franchisee's territory, and that Papa John's has no duty to "protect" the franchisee from any such sales, solicitations, or attempted sales.[26]

58.     The Papa John's FDD also warns prospective franchisees that except as provided in a "Development Area" agreement (contemplating a schedule for opening multiple restaurants), the franchisee will not be granted any "option, right of first refusal or similar right to acquire additional restaurants . . . ."[27]

### *The Agreement Not to Compete for Employees*

59.     Notwithstanding that each franchise is an independently owned and operated business that competes with other franchises and with company-owned restaurants, and notwithstanding that each (ostensibly) has "full responsibility for the conduct and terms of employment for [the franchisees'] employees and the day-to-day operation of [the franchisees'] business, including hiring, termination, pay practices and any other employment practices,"[28] Papa John's franchisees have agreed not to compete with each other or with Papa John's with respect to hiring employees.   This agreement was and is evidenced by and memorialized in explicit contractual terms contained in franchisees' Papa John's franchise agreements.

60.     In particular, each franchisee who signed a new (or renewed) franchise agreement beginning no later than 2010 and continuing through at least November 2017, agreed not to, "during the Term and for a period of one year after expiration or termination of the Franchise, employ or seek to employ any person who is employed by [Papa John's], [Papa John's] Affiliates

---

[26]     *See id.*

[27]     FDD, Item 12.

[28]     FDD, Item 11.

or by any of [Papa John's] franchisees, or otherwise directly or indirectly solicit, entice or induce any such person to leave their employment."[29]

61.     In executing the franchise agreement, franchisees contractually agree that any violation of the no-poach, no-hire agreement is a non-curable default of the franchise agreement providing grounds for termination upon notice.[30]  A violation of the no-poach agreement would thus risk the franchisee's initial franchise fee and its entire investment in the business.

62.     Franchise termination carries additional risks.  Franchisees agree to injunctive relief and specific performance obligations, and also agree to pay Papa John's "all damages, costs and expenses, including reasonable attorneys' fees" incurred by Papa John's in obtaining injunctive or other relief for the enforcement of the agreement.[31]  Franchisees also covenant that for a period of two years after termination (or expiration) of the franchise, they will not engage "directly or indirectly" in any "Competitive Business" (as defined in the agreement) within a 10-mile radius of either the restaurant or any location that operates another Papa John's restaurant.[32]

---

[29]     FA, ¶16(e).  As noted above, as a part of the September 12, 2018 Assurance of Discontinuance that Papa John's entered into with the Washington AG, Papa John's asserted that it "elected to remove" the no-solicit and no-hire provision from new franchise agreements "in November 2017."  It did not, however, remove the provision from existing franchise agreements at that time.  Papa John's agreed with the Washington AG in September 2018 to attempt to amend existing agreements ***with entities in Washington*** in order to remove any no-poaching provisions. It has never agreed to do so with respect to existing non-Washington franchise agreements.  And while the standard restaurant franchise agreement appended to Papa John's 2018 Franchise Disclosure Document (dated March 9, 2018) no longer contains the no-poaching provision; the provision remains in the 2018 franchise agreement for "Non-Traditional Restaurants."

[30]     FA, ¶19(b).

[31]     *Id.*, ¶20(a)(ii).

[32]     *Id.*, ¶20(a)(x).

63.     Violation of the no-poach agreement thus subjects the franchisee to potential non-curable default and termination of the franchise, attorneys' fees and costs, and the damage of a covenant to not compete against Papa John's for two full years after termination.

64.     Papa John's franchises, like other franchises, are made available on standardized terms.  So, a franchisee who enters into a Papa John's franchise agreement knows that the same terms it has agreed to also apply to other franchisees.

65.     One of the standard terms in Papa John's franchise agreements with all its franchisees (at least until November 2017) is the no-poach provision referred to above.

66.     Even though Papa John's removed the no-poach language from its standard restaurant franchise agreements signed either after November 2017, or signed on or after March 9, 2018, thousands of Papa John's franchise restaurants were already (and remain) in existence and operating under older versions of the franchise agreement that contain the restraint.  The restraint provision also continues to exist in non-traditional store franchise agreements signed even after March 9, 2018.

67.     The Papa John's franchise agreement contains an integration clause.  Franchisees specifically contract for a franchise that is governed by the terms of the franchise agreement a franchisee executes and not by terms later agreed-to by other franchisees.  Papa John's informs prospective franchisees that the terms of the contract will govern the franchise.

68.     The Papa John's FDD includes a list of all Papa John's franchisees, organized by name and address.  Franchisees thus know that these entities are the other franchisees as to whom the no-poach agreement memorialized in the franchise agreement applies.

69.     The no-poach and no-hire agreement among Papa John's and its franchisees is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

70.     The no-poach and no-hire agreement does not serve the interests of ensuring that Papa John's restaurants produce a quality product.

71.     The no-poach and no-hire agreement does not serve fast-food customers because it does not incentivize Papa John's and franchisees to invest in training workers to improve the Papa John's food, experience, and service.

72.     Consumers can gain from competition among employers because a more competitive workforce may create more or better goods and services.  Further, unemployment is at record lows, yet wage growth has remained sluggish. Fast-food workers regularly rely on public assistance to supplement their income.  Higher wages would lessen the strain on public assistance, benefiting all consumers.

73.     The no-poach and no-hire agreement is not in the independent interest of Papa John's franchisees and restaurants if acting unilaterally.  Employees are critical to the success of Papa John's franchises and restaurants.  A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.  Therefore, it is in the independent interest of each Papa John's franchisee to compete for the most talented and experienced restaurant employees.

74.     By adhering to the no-poach and no-hire agreement, franchisees artificially restrict their own ability to hire employees in a manner that is inconsistent with their own unilateral economic interests.  By acting in concert, however, they also protect themselves from having their own employees poached by other franchises that see additional value in those employees, such as

20

their training, experience and/or work ethic.  This allows franchisees and Papa John's to retain their best employees without having to pay market wages to these employees or compete in the market place relative to working conditions and promotion opportunities.

75.     Most importantly, the no-poach and no-hire agreement does not serve restaurant employees because it does not incentivize Papa John's or franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor.  It also dis-incentivizes employees to perform their best work as those efforts are not rewarded commensurately.  Competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

76.     Papa John's franchisees and company-owned restaurants have a shared interest, however, in keeping labor costs low.  As noted above, franchisees pay to Papa John's royalties based on a percentage of gross sales.  Cost of labor therefore has a direct impact on franchisee profitability.  By agreeing to not compete for labor, franchisees act against their unilateral self-interest, but serve their shared interest.

77.     But for the no-poach agreement, each Papa John's franchise is its own economic decision-maker with respect to hiring, firing, staffing, promotions, and employee wages.  But for the no-poach agreement, each Papa John's franchise would compete with Papa John's and with each other for the best-performing employees.

### Other Evidence of Papa John's System-Wide Commitment to Suppressing Employee Wages and Mobility and of the Unlawful Agreement

78.     Low wages are consistent, even if not uniform, across the Papa John's system.  This has allowed Papa John's owners and executives, and Papa John's franchisees, to become wealthy while full-time, hardworking employees often must resort to government benefits just to put food

on their own tables.  A significant reason for this is that Papa John's has orchestrated an agreement among franchisees to stifle employee wages and mobility.

79.     The average fast-food worker in the United States makes approximately $19,900 per year, while the average fast-food CEO earns $1.2 million per year.

80.     If Papa John's and franchisees had to either pay and promote good employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities.  However, because of the no-hire agreement, and because the education, training, and experience within the Papa John's system are unique to Papa John's and not transferrable to other restaurants, Papa John's and franchisees do not have to compete with other Papa John's franchisees, and do not have to compete with non-Papa John's businesses for their employees.

81.     Hart Research Associates surveyed 1,088 fast food workers in 10 major metro areas, and found that 89% of fast food workers have experienced wage-theft, in multiple forms, at their fast food job.  Wage theft occurred through forcing employees to work off the clock, not paying workers for all hours worked, denying breaks, and failing to pay for overtime.[33]

82.     From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually because of low wages.

83.     Papa John's is a member of the American Pizza Community ("APC"), a powerful arm of the food industry lobby specifically speaking for "Big Pizza."  The APC coalition was founded in 2010 and includes many of the nation's other largest pizza retailer chains, including Domino's, Little Caesars, and Pizza Hut – each of which, like Papa John's, is a franchisor.  Among

---

[33]     *See* Hart Research Associates, *Key Findings for Survey of Fast Food Workers* (April 1, 2014), http://big.assets.huffingtonpost.com/NationalWageTheftPollMemo.pdf (last visited Nov. 1, 2018).

other causes, the APC has been an active critic of the Department of Labor's final ruling on overtime eligibility in 2016.  That ruling doubled the overtime salary threshold from $23,660 to $47,476, guaranteeing overtime pay for millions of additional workers.  The APC previously opposed a minimum wage hike in California and lists labor employment policies as among the top issues on its website.

84.     Papa John's and its franchisees are well-versed in no-poaching efforts as they regularly employ highly restrictive "non-compete" agreements binding the franchise owners. Pursuant to the franchise agreement, both during and after the franchise term, Papa John's franchisees are contractually prohibited from engaging, directly or indirectly, in any other business that operates restaurants that sell pizza or any other products that are the same as those sold by Papa John's restaurants.

85.     Additional evidence also supports the notion that franchisees have agreed not to hire each other's employees and had means to police that agreement.

86.     Papa John's form employee applications include a specific inquiry into whether the candidate has previously been employed at a Papa John's restaurant.  The application requests information about the dates and location of any such employment.  The potential employer can use this information to quickly determine whether the no-hire agreement is implicated for an applicant.

87.     In addition to their shared motivation to enforce the no-poach and no-hire agreement, and their actual understanding of the no-poach and no-hire agreement, Papa John's franchisees also have abundant opportunity to communicate about and coordinate their agreement. Papa John's holds regular or annual business conferences or conventions, at which franchisees have an opportunity to meet and discuss their no-poaching scheme.  In addition, the Papa John's Franchise Association also conducts regular meetings or conferences of franchisees.

***Employment with Non-Papa John's Brands Is Not a Reasonable Substitute for Papa John's Employees***

88.     Training, education, and experience within the Papa John's system are not transferrable to other restaurants for a number of reasons.

89.     Papa John's characterizes its restaurants as being part of a "unique system which includes . . . special recipes and menu items; . . . software and programs; standards, specifications and procedures for operations systems for communicating with [Papa John's], suppliers and customers; procedures for quality control; training and assistance; and advertising and promotional programs[.]"[34]

90.     Papa John's restaurants and franchisees utilize Papa John's own operations systems, including certain mandatory specifications, standards, and operating procedures set forth in Papa John's manuals.  Papa John's treats all information in the Manuals, policy and procedure statements, and other notices as confidential information and trade secrets.  Experience and training with these systems is of little value to other restaurants.

91.     Papa John's restaurants and franchisees utilize a specified "Information System" and "Designated Software."  These may include the brands, types, makes and/or models of communications and computer systems, hardware, and network devices Papa John's requires, along with point-of-sale systems, information storage, retrieval and transmission systems and security systems.  The Designated Software includes proprietary programs Papa John's treats the Information System as proprietary to Papa John's.  Experience with these systems is of little value to other brand restaurants.

---

[34]     FDD, Item 1.

92.     Papa John's restaurants and franchisees use approved or mandatory suppliers and vendors affiliated with Papa John's.  Experience with these vendors is of little value to other restaurants.

93.     A no-poach and no-hire agreement like the agreement between and among Papa John's and its franchisees reduces employees' outside options and lowers their quit rate, thereby increasing the share of net-returns captured by employers.  Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can be used only by a single franchisee pursuant to the agreement.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS
## AND ANTITRUST INJURY

94.     Plaintiff Jay Houston began working at NOCO Pizza, Inc's Papa John's restaurant in Fort Collins, Colorado in June 2018.  At all relevant times, Houston was and is an at-will employee, paid on an hourly basis.

95.     Houston works as a Prep Cook and Driver for minimum wage and has received no raises or promotions.  Houston works about six to seven hours per day, approximately five to six days per week.  Houston gets paid an hourly rate of $10.20 per hour while working in-restaurant and $7.18 per hour plus tips when making deliveries.  Houston is currently employed by NOCO Pizza, Inc.'s Papa John's restaurant.

96.     The no-poach and no-hire agreement between and among Papa John's and its franchisees suppressed Plaintiff's wages, inhibited his employment mobility, and lessened his professional work opportunities.

*Antitrust Injury*

97.     Plaintiff suffered reduced wages, reduced employment benefits, loss of professional growth opportunities, and worsened working conditions because of the express restraint of trade among Papa John's and its franchisees, as orchestrated by Papa John's itself.

98.     Suppressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flow from that which makes the no-hire agreement unlawful.

99.     Indeed, the no-poach and no-hire agreement embodies norms that are widely accepted across the fast-food industry and are familiar to franchisees.  In advising new restaurant owners on how to hire employees, one industry expert instructs that "you have to be careful that you do not earn a reputation for stealing other people's employees."

100.    The potential for broader collusion in franchise chains is enhanced when no-poach agreements are in place.  Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

101.    The Papa John's no-hire agreement significantly restricts employment opportunities for low-wage workers at all Papa John's restaurants, including those who have not sought employment with a competitor franchise and those who have not been contacted by a competitor franchise.  Such a restriction causes a wider effect upon all Papa John's employees.

102.    Plaintiff was a victim of the no-poach and no-hire agreement.  By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action on his own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).  The class is defined as:

> All persons in the United States who are current or former employees at all Papa John's restaurants.

104.    Excluded from the Class are Defendants, their affiliates, officers and directors, and the Court.  Plaintiff reserves the right to modify, change, or expand the Class definition on discovery and further investigation.

105.    Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Papa John's restaurants in the U.S.  While the exact number and identities of the individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that thousands of Class members are the subjects of the Class.

106.    Existence and Predominance of Common Questions of Fact and Law:  Common questions of fact and law exist as to all members of the Class.  These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, whether:

> a.      Defendants orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;
>
> b.      Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§1, *et seq.*;
>
> c.      Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

d.  Plaintiff and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

e.  The amount and nature of such relief to be awarded to Plaintiff and the Class.

107.  Typicality:  All of Plaintiff's claims are typical of the claim of the Class inasmuch as Plaintiff was a Papa John's restaurant employee and each member of the Class either was or is a Papa John's restaurant employee subject to the same agreements and rules as Plaintiff.  Further, Plaintiff and all the members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendants for themselves and all absent Class members.

108.  Adequacy:  Plaintiff is an adequate representative because his interests do not conflict with the interest of the Class that he seeks to represent, he has retained counsel which is competent and highly experienced in complex class action litigation, and he intends to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

109.  Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class.  The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent

or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

110.    Defendants have acted, and refuse to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## **FRAUDULENT CONCEALMENT**

111.    Plaintiff and the Class members had neither actual nor constructive knowledge of the unlawful no-poach and no-hiring conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiff or the Class have put them on notice of the conspiracy. Any statute of limitations is therefore tolled by Defendants' intentional concealment of their no-poach and no-hire agreement.   Plaintiff and the Class members were deceived regarding Defendants' collusion to suppress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

112.    Neither Defendants nor franchisees disclosed the existence of the no-poach and no-hire conspiracy to Plaintiff or the Class members.

113.    Papa John's public statements conceal the fact that it orchestrated and engaged in a no-poach and no-hire conspiracy among franchisees.

114.    In describing its work culture to employees and prospective employees, Papa John's says "Our biggest ingredients are our people."[35]  Papa John's tells prospective employees

---

[35]     https://jobs.papajohns.com/creative/culture (last visited November 9, 2018).

that "We believe in rewarding the hard work and inspiring ideas of our associates, at all levels throughout our organization. And we offer many ways to grow."[36]

115.     Papa John's tells prospective employees that "At Papa John's, it's possible to start with just your talent and become something greater. Here, it's not uncommon for a team member to transition into management . . . And as you grow, we'll be there to encourage you, recognize you and provide the resources you need to accomplish your professional aspirations."[37]  These statements conceal the fact that Papa John's and its franchisees have in fact colluded to suppress the wages of restaurant employees.

116.     The hiring section of Papa John's website directs prospective employees to a "Search Jobs" utility that identifies particular openings available at specific franchise and store locations in the geographic area selected by a prospective employee.  On its website, Papa John's also informs visitors that "employees of franchised restaurants are not employees of Papa John's corporate and Papa John's corporate does not set or control the terms of employment at its franchised restaurants.  Employment terms, including pay, hours and benefits will be determined by the franchisee-owner of the franchised restaurant and may not be the same as those offered by Papa John's corporate."[38]  These statements highlight the supposed independence of franchisee-employers and conceal the existence of the collusive no-poach agreement.

117.     As alleged above, each franchisee similarly informs its employees that it has "full responsibility for the conduct and terms of employment for [its] employees and the day-to-day

---

[36]      http://www.papajohnshiring.com/ (last visited November 9, 2018).

[37]      https://jobs.papajohns.com/creative/careergrowth (last visited November 9, 2018).

[38]      *See* https://jobs.papajohns.com (last visited Nov. 1, 2018).

operation of [its] business, including hiring, termination, pay practices and any other employment practices."[39]  Franchisees display notice at "conspicuous" locations informing employees that the franchisee, and not Papa John's, is the employer.  Franchisees identify themselves to employees as "independently owned and operated," and identify themselves as such in conjunction with the use of Papa John's marks and in employment-related documents.  These actions also conceal the existence of the collusive no-poach agreement.

118.    In its Code of Ethics and Business Conduct, Papa John's asserts that it "complies with all applicable labor and employment laws and regulations," and acknowledges that "[a]ntitrust laws prohibit agreements among companies that fix prices, divide markets, limit production or otherwise interfere with the free marketplace."[40]  Papa John's asserts that its Officers, Directors, and Team Members all "have the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards."[41]  These statements conceal the existence of the collusive no-poach agreement.

119.    Plaintiff and the Class would thus have no reason to know of the no-poach and no-hire agreements evidenced by franchisees' contractual undertakings with Defendants.  Plaintiff and the Class are not parties to franchisees' contractual franchise agreements with Papa John's.  Nor are these contracts routinely provided to Plaintiff.

120.    Although Defendants provide their form franchise documents to state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants

---

[39]      FA, ¶11(c).

[40]      *See* Code of Ethics at 8.

[41]      *Id.* at 1.

only upon request by prospective franchisees.  Obtaining Defendants' historic franchise disclosure documents and form franchise agreements is even more difficult.

121.    In order to obtain Defendants' current franchise disclosure documents and form franchise agreement from Papa John's, a prospective franchisee must submit an application (with supporting documents) seeking to open a franchise.  Only after Papa John's reviews the application to ensure that the franchisee meets initial qualifications does Papa John's provide the franchise disclosure document.  Prospective franchisees are told that in order to qualify for consideration, they should have a minimum of $75,000 in cash or liquid assets, a net worth of $250,000 or greater, and have the ability to obtain financing up to $275,000 to cover the cost of opening a location.  Even these are called "minimum requirements," which "do not represent the total potential costs to open and operate one or more Papa John's units."[42]

122.    Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of restaurants, whether by Defendants, by franchisee employers, by regulators, or by anyone else.  Historic franchise disclosure documents and form franchise agreements would never be available to franchisee employees or prospective employees.

123.    Even upon entering into the Assurance of Discontinuance with the Washington AG, Papa John's continued to deny that the no-poaching language in its franchise agreements was in violation of any law.

---

[42]    https://www.papajohns.com/franchise/franchise-ownership-process.html (last visited Nov. 1, 2018).

124.    Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiff and the Class members had no reason to know Defendants had conspired to suppress compensation or employee mobility.

125.    As a result of Defendants' fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF SECTION 1 OF THE
### SHERMAN ACT, 15 U.S.C. §1, *et seq.*

126.    Plaintiff, on behalf of himself and all others similarly situated, re-alleges and incorporates by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendants as follows:

127.    Beginning no later than 2010, Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

128.    Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition with and among Papa John's franchisees, which unfairly suppressed employee wages, and unreasonably restrained trade.

129.    Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchise owners with the intent, purpose and effect of: (a) artificially suppressing the compensation of Plaintiff and the Class members; (b) eliminating competition with and among franchise owners for skilled labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

130.    Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

131.    Defendants' conduct in furtherance of the no-poach and no-hire agreement was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

132.    Plaintiff and the Class members have received lower compensation from Papa John's and franchise businesses than they otherwise would have received in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

133.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

134.    In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

135.    Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

136.    As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and the Class members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

137.    Plaintiff and the Class members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. §26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class respectfully request that the Court:

A.     Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.     Appoint Plaintiff as the representatives of the Class and his counsel as Class Counsel;

C.     Declare that Defendants' actions as set forth in this Complaint violate the law;

D.     Award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.     Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled;

F.     Grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G.     Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

H.     Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

I.     Award pre-judgment and post-judgment interest on such monetary relief;

J.     Award reasonable attorneys' fees and costs; and

K.     Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 14, 2018

*/s/Jennifer A. Moore*
Jennifer A. Moore
Ashton Rose Smith
**GROSSMAN & MOORE, PLLC**
401 West Main Street, Suite 1810
Louisville, KY 40202
Tel: 502-657-7100
jmoore@gminjurylaw.com
asmith@gminjurylaw.com

Derek Y. Brandt*
Leigh M. Perica*
**McCUNE WRIGHT AREVALO, LLP**
101 West Vandalia Street, Suite 200
Edwardsville, IL 62025
Tel: 618-307-6116
dyb@mccunewright.com
lmp@mccunewright.com

Richard D. McCune*
Michele M. Vercoski*
**McCUNE WRIGHT AREVALO, LLP**
3281 East Guasti Road, Suite 100
Ontario, CA 91761
Tel: 909-557-1250
rdm@mccunewright.com
mmv@mccunewright.com

Walter W. Noss*
Stephanie A. Hackett*
Sean C. Russell*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 West Broadway, Suite 3300
San Diego, CA  92101
Tel: 619-233-4565
wnoss@scott-scott.com
shackett@scott-scott.com
sean.russell@scott-scott.com

Michelle E. Conston*
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
mconston@scott-scott.com

*Counsel for Plaintiff and the Class*

\* Applications pro hac vice to be submitted.