### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF KENTUCKY
### LOUSIVILLE DIVISION

<table>
<tr><td>IN RE: PAPA JOHN'S EMPLOYEE AND FRANCHISEE EMPLOYEE ANTITRUST LITIGATION</td><td>Case No.: 3:18-cv-00825-JHM-RSE<br><br>**JURY TRIAL DEMANDED**</td></tr>
</table>

### CONSOLIDATED AMENDED COMPLAINT

Plaintiffs Jay Houston, Ashley Page, and Jamiah Greer, on behalf of themselves and all others similarly situated, with knowledge as to their own actions and events, and upon information and belief as to other matters, allege as follows:

### NATURE OF THE ACTION

1.  In its Code of Ethics and Business Conduct, Papa John's International, Inc. asserts that it "complies with all applicable labor and employment laws and regulations," and acknowledges that "[a]ntitrust laws prohibit agreements among companies that fix prices, divide markets, limit production or otherwise interfere with the free marketplace."[1]   This action challenges, under Section 1 of the Sherman Act, 15 U.S.C. §1, just such an agreement.   For years, Defendants Papa John's International, Inc. and Papa John's USA, Inc. (together, "Defendants" or "Papa John's") orchestrated an Agreement between and among Papa John's restaurant franchisees, pursuant to which the franchisees agreed not to hire or solicit each other's employees or Papa John's employees (hereinafter the "No-Hire Agreement").   The No-Hire Agreement was not reasonably necessary to any legitimate procompetitive benefit.   It was

---

[1]   *See* Papa John's International, Inc. Code of Ethics and Business Conduct (July 2018, hereafter "Code of Ethics") at 8, https://ir.papajohns.com/static-files/2f3a19d7-4de1-4dd3-b0fc-8cb32ffd13b1 (last visited Feb. 18, 2019).

nothing more than a market allocation agreement, a category of restraint long held to be *per se* unlawful under the antitrust laws.

2.      Plaintiffs and the Class are current and former employees of Papa John's restaurants.  Plaintiffs and the Class suffered depressed wages and benefits and diminished employment opportunities as a result of the No-Hire Agreement.

3.      Papa John's is the fourth largest pizza company in the world.[2]  Papa John's has franchise restaurants in all 50 U.S. states (plus the District of Columbia).[3]  As of 2017, approximately 2,739 of the 3,442 Papa John's U.S. restaurants (roughly 80%) were franchise restaurants.  The remainder are owned and operated by Papa John's.

4.      Franchise restaurants are independently owned and operated by franchisees, each of which executes a franchise agreement with Papa John's.  Franchisees are separate and distinct legal entities from Papa John's.  Papa John's expressly warns franchisees that they may face competition from other franchises or from Papa John's owned or operated restaurants.  This includes competition for customers and employees.

5.      Labor costs are one of the largest expenses associated with running a Papa John's restaurant.  In its 2017 annual report, Papa John's acknowledged "higher labor costs and increased competition for qualified team members" presented a substantial risk to its business.[4]

6.      Papa John's franchisees and Papa John's colluded to depress the wages and employment opportunities of employees who work in Papa John's branded restaurants

---

[2]      *See* https://ir.papajohns.com/investor-faqs (last visited Feb. 18, 2019).

[3]      *See*  https://www.entrepreneur.com/franchises/papajohnsintlinc/282662,  ENTREPRENEUR (last visited Feb. 18, 2019).

[4]      Papa John's Form 10-K Annual Report for the fiscal year ending December 31, 2017 (hereafter "Annual Report") at 17, available at https://www.sec.gov/Archives/edgar/data/901491/000155837018001176/0001558370-18-001176-index.htm.

throughout the United States.  In particular, Papa John's and its franchisees have agreed to not solicit or hire each other's employees.  This No-Hire Agreement was evidenced by franchisees' written pledge in their standardized franchise agreements.  They agreed to the following:

> You covenant that you will not, during the Term and for a period of one year after expiration or termination of the Franchise, employ or seek to employ any person who is employed by us, our Affiliates or by any of our franchisees, or otherwise directly or indirectly solicit, entice or induce any such person to leave their employment.[5]

Every franchisee executing a franchise agreement until at least November 2017 joined this same agreement.

7.      Each franchisee also agreed to onerous penalties for any violation of the No-Hire Agreement.  In "addition to all other remedies," franchisees agreed that Papa John's is entitled to injunctive relief and specific performance in the event of breach, and that Papa John's may terminate – without opportunity to cure – the franchise of a franchisee who violates the no-solicit, no-hire provision.[6]  Franchisees further agreed that Papa John's would be entitled upon termination to "all damages, costs and expenses, including reasonable attorneys' fees" incurred in obtaining injunctive or other relief for the enforcement of any provision of the franchise agreement.[7]  Franchisees also agreed to additional post-termination provisions, as more fully discussed below.

8.      The Papa John's No-Hire Agreement is an unreasonable restraint of trade.  As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked

---

[5]      Papa John's International, Inc., 2017 Standard Restaurant Franchise Agreement (hereafter, "FA"), ¶16(e).

[6]      *Id.*, ¶16(h).

[7]      *Id.*, ¶20(a)(vii).

wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third party intermediary, are per se illegal under the antitrust laws."[8]  The DOJ/FTC Guidance elaborates:

> From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services.  It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.[9]

9.     Consistent with the DOJ's Guidance, the Washington Attorney General concluded in July 2018 that the Papa John's No-Hire Agreement constituted an agreement in restraint of trade that "restricts worker mobility and decrease[s] competition for labor by preventing workers from moving among the chain[]'s franchise locations."[10]  The Washington AG also determined that this reduction in competition artificially reduced employee compensation during the Class Period by "put[ting] downward pressure on wages."[11]  In September 2018, Papa John's and the Washington AG entered into a judicial consent order requiring Papa John's to eliminate the No-Hire Agreement from future franchise agreements and not to enforce existing agreements.

10.     Economists have confirmed the Washington AG's findings that no-hire agreements (often referred to as no-poach agreements), like the one implemented among Papa John's and its franchisees, depress employee compensation by artificially reducing competition in the labor market.  Princeton University economists Alan Krueger and Orley Ashenfelter have studied franchise agreements extensively, and they conclude: (1) that "[a]greements to refrain

---

[8]     *See* https://www.justice.gov/atr/file/903511/download (last visited Feb. 18, 2019).

[9]     *Id.*

[10]     *See* AG FERGUSON ANNOUNCES FAST-FOOD CHAINS WILL END RESTRICTIONS ON LOW-WAGE WORKERS NATIONWIDE, Washington State Office of the Attorney General (July 12, 2018), https://www.atg.wa.gov/news/news-releases/ag-ferguson-announces-fast-food-chains-will-end-restrictions-low-wage-workers (last visited Feb. 18, 2019).

[11]     *Id.*

from recruiting and hiring away employees from other units in a franchise chain are common in franchise contracts"; (2) that those agreements can limit turnover, reduce labor market competition, and reduce workers' job opportunities; and (3) that the prevalence of such agreements may help to explain why wage growth has been sluggish despite low unemployment rates.[12]

11.     The Papa John's No-Hire Agreement restrains competition for hiring employees among Papa John's restaurants.  It is a restraint of trade that is *per se* unlawful under Section 1 of the Sherman Act, 15 U.S.C. §1.  As a result of the No-Hire Agreement,  Plaintiffs and the Class suffered antitrust injury in the form of depressed wages.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

12.     The Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

13.     The Court has both general and specific personal jurisdiction over Defendants. Defendants are citizens of this District, and Defendants' collusive acts which gave rise to Plaintiffs' claims took place, in substantial part, in this District.

14.     Venue is proper in this judicial district under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§15, 22, and 26, and under 28 U.S.C. §1391(b)(2), (c)(2).  Papa John's transacts or has transacted business in this district.  A substantial part of the events that gave rise to this action occurred in this district, including the participation in the conspiracy by and between Papa John's and Papa John's franchisees located throughout the United States.

15.     Defendants' acts were within the flow of, were intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States.   Papa John's brand

---

[12]     Alan B. Kreuger and Orley Ashenfelter, *Theory and Evidence on Employer Collusion in the Franchise Sector*, NATIONAL BUREAU OF ECONOMIC RESEARCH (July 2018) at 20-1.

restaurants are in each state in the United States.  Papa John's engages in substantial business activities with each franchised restaurant, including entering into a contractual franchise agreement with the owner of the franchise.  Papa John's engages in substantial activities at issue in this Complaint that are in the flow of and substantially affect interstate commerce.

## THE PARTIES

*Plaintiffs*

16.     Plaintiff Jay Houston is a resident of Fort Collins, Colorado.  He is currently employed by NOCO Pizza, Inc., a Papa John's franchisee that owns and operates the Papa John's store located at 1275 East Magnolica, in Fort Collins, North Carolina.  Houston works as a Prep Cook and Driver for minimum wage and has received no raises or promotions.  Houston works about six to seven hours per day, approximately five to six days per week.  Houston is paid an hourly rate of $10.20 per hour while working in-restaurant and $7.18 per hour plus tips when making deliveries.  Plaintiff Houston suffered injury, including depressed wages, as a result of the No-Hire Agreement between and among Papa John's and its franchisees.

17.     Plaintiff Ashley Page is a resident of York, Pennsylvania.  She was employed by MD/PA Pizza, LLC, a Papa John's franchisee that owns and operates the Papa John's store located at 3000 East Market Street, in York, Pennsylvania during the Class Period.  Page worked at that Papa John's franchise from January 19, 2017 through September 17, 2018, and she was promoted to store manager approximately six months after she began employment there.  Plaintiff Page suffered injury, including depressed wages, as a result of the No-Hire Agreement between and among Papa John's and its franchisees.

18.     Plaintiff Jamiah Greer is a resident of Cobb County, Georgia.  She was employed at a Papa John's restaurant in Austell, Georgia during the Class Period.  Greer received no raises

or promotions while employed at the Austell Georgia Papa John's location.  Greer subsequently applied for a position at a different Papa John's restaurant.  The new position promised an opportunity for more hours and an increase in compensation.  During the interview process, Greer was told, while her experience working at Papa John's made her an ideal candidate for this job, her current employer had to be consulted before she was offered the position.  Greer followed up several times with this Papa John's restaurant regarding the status of her application in the coming weeks.  Each time she was told that a new requirement, such as additional paperwork or documentation, prevented her from being hired at that time.  These requirements were purely pretextual and not legitimate.  Greer was not offered that position because of the No-Hire Agreement alleged herein.  Plaintiff Greer suffered injury, including depressed wages and deprived job opportunities, as a result of the No-Hire Agreement between and among Papa John's and its franchisees

### *Defendants*

19.   Defendant Papa John's International, Inc. ("PJI") is a Delaware corporation with its principal place of business at 2002 Papa John's Boulevard, Louisville, Kentucky 40269-0900.  Papa John's International, Inc., is the franchisor of Papa John's brand franchise restaurants in the United States.  Papa John's International, Inc., also owns a majority interest in a number of Papa John's franchisee restaurants.

20.   Defendant Papa John's USA, Inc. ("PJ USA") is a Kentucky corporation with its principal place of business at 2002 Papa John's Boulevard, Louisville, Kentucky 40269-0900.  Papa John's USA, Inc. is a wholly-owned subsidiary of Papa John's International, Inc.  Among other functions, it owns and operates Papa John's restaurants in the United States.

21.   Papa John's is in the business of selling food to customers primarily through independently owned and operated franchise restaurants.  Papa John's has multiple franchise

restaurants in every U.S. state and the District of Columbia.  It owns and operates company-owned restaurants in approximately 25 U.S. states.

22.      PJI and PJ USA operate as a single entity.  PJI is: (1) the single decision-making source for both PJI and PJ USA, and (2) exercises definitive control over and has common ownership of company-owned Papa John's restaurants with PJ USA.

23.      As of 2017, PJI and PJ USA operated out of the same location and shared the same directors and executives, as shown in the table below:

| **PJI** | **PJ USA** |
|---|---|
| **John H. Schnatter** = Chairman and Chief Executive Officer. | **John H. Schnatter** = Chairman and Chief Executive Officer. |
| **Lance F. Tucker** = Chief Financial Officer, Treasurer, Senior Vice President ("SVP"), Chief Accounting Officer. | **Lance F. Tucker** = Chief Financial Officer, Treasurer, Vice President ("VP"), Board Member. |
| **Steve M. Ritchie** = President, Chief Operating Officer. | **Steve M. Ritchie** = President, COO, Board Member. |
| **Sean A. Muldoon** = SVP, Chief Ingredient Officer. | **Sean A. Muldoon** = VP. |
| **R. Shane Hutchins** = SVP, Papa John's Food Service | **R. Shane Hutchins** = VP. |
| **Caroline Oyler** = SVP, General Counsel. | **Caroline Oyler** = VP. |
| **Jack H. Swaysland** = SVP, International. | **Jack H. Swaysland** = VP. |
| **Timothy O'Hern** = SVP, Chief Development Officer. | **Timothy O'Hern** = VP. |
| **Edmond Heelan** = SVP, North American Operations. | **Edmond Heelan** = VP. |
| **Robert E. Thompson** = SVP, Marketing. | **Robert E. Thompson** = VP. |

24.     PJI does not distinguish itself from PJ USA in its Annual Reports, taking responsibility for both the operation of Papa John's restaurants, and licensing of the Papa John's brand to franchisees:

> Papa John's International, Inc., a Delaware corporation (referred to as the "Company," "Papa John's" or in the first person notations of "we", "us" and "our") operates and franchises pizza delivery and carryout restaurants and, in certain international markets, dine-in and delivery restaurants under the trademark "Papa John's."[13]

25.     PJI also refers to company-owned restaurants that it operates through PJ USA as its own. For example, in the same 2017 Annual Report, PJI stated that:

> Although most of our domestic Company-owned markets are well-penetrated, our Company-owned growth strategy is to continue to open domestic restaurants in existing markets as appropriate, thereby increasing consumer awareness and enabling us to take advantage of operational and marketing efficiencies.[14]

## AGENTS AND CO-CONSPIRATORS

26.     Defendants' agents, including their officers, employees, or other representatives, ordered, authorized, or performed the acts alleged in this Complaint on Defendants' behalf in the normal course of their duties as Defendants' agents engaged to manage and operate Defendants' businesses or affairs.

27.     Each Defendant acted as the principal, agent, or partner for other Defendants with respect to the acts, violations, and common course of collusive conduct alleged herein.

28.     Various other corporations and persons not named as defendants in this Complaint, including Papa John's franchisees, participated as co-conspirators in the violations alleged and performed acts in furtherance of the conspiracy to depress wages.

---

[13]     Annual Report at 3.

[14]     Annual Report at 6.

## ADDITIONAL FACT ALLEGATIONS

29.     Papa John's franchisees and company-owned restaurants compete with each other.  In a properly functioning and lawfully competitive labor market, Papa John's franchisees and company-owned restaurants would compete for labor.  A properly functioning market would involve prospective employers freely communicating with prospective employees – even if the employee does not first express interest.

30.     For instance, if Franchise A believes that a certain employee performs his or her job well at Franchise B, then Franchise A would be free to contact that employee about an employment opportunity.  Conversely, if an employee of Franchise B perceives Franchise A to be a better organization – whether because of increased wages, better benefits, a more convenient location, or otherwise – then the employee would be free to communicate with Franchise A about potential employment.  Soliciting is a key competitive tool for companies seeking to recruit employees, particularly employees with skills that are difficult or costly to develop in new employees, such as brand-specific training.

31.     The Papa John's No-Hire Agreement, however, prohibits such lateral hiring of employees because Franchise A cannot solicit or hire Franchise B's current employee or even a former employee who worked at Franchise B within the past year.  Franchise A also cannot solicit or hire current or former employees of restaurants operated by Papa John's.

32.     No-hire agreements significantly impact employee compensation.  For example, an employee of Franchise B will lack information regarding Franchise A's compensation, benefits, and conditions of employment unless communications are permitted; without such information, the employee lacks leverage when negotiating for a raise or promotion, among other things, with Franchise B.  Similarly, unconstrained by a No-Hire Agreement, if an employee of

Franchise B receives an offer of higher compensation from Franchise A or a restaurant operated by Papa John's, the employee can either accept that offer or attempt to negotiate a pay increase with Franchise B.  Either way, the employee's compensation increases.  The No-Hire Agreement eliminated this competition.

33.     The beneficial effects of competition (and beneficial effects on compensation) are not limited to those particular individuals who speak to a rival company about an employment opportunity.  The effects also reach all similarly situated employees because of the effect on information flow and on competition for labor.  An employee of Franchise B who receives information regarding potential compensation from a rival employer will also likely inform other Franchise B employees.  These Franchise B employees can then use that information to negotiate pay increases or move to another employer.  Increased mobility combined with increased information and transparency regarding compensation levels tends to increase compensation across all employees.  After all, there is pressure amongst rival employers to match or exceed the highest compensation package offered by rivals in order to gain and retain employees.

34.     Because the owners of Franchise A and Franchise B know that they have eliminated labor competition between them through the No-Hire Agreement, each understands that they do not need to compensate their employees as much as they would otherwise to retain them and head off competitive threats.

35.     Agreements to allocate service markets such as the No-Hire Agreement are functionally the same as agreements to allocate territories for the sale of products.  Both are simply a means to fix prices.  "In terms of depressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each

other's customers," says Joseph Harrington, Wharton professor of business economics and public policy.

36.    According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, agreements not to compete for each other's employees are unfair to employees and such a pact "benefits the companies at the expense of their employees."  Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

37.    Further, agreements to allocate service markets can be much more pernicious than agreements to allocate product markets.  Every employer exercises market power over its employees in a manner that surpasses the market power of nearly every seller of products over its customers.  The reason is that the employment relationship is much stronger than the customer relationship.  First, it is difficult and costly to switch employers: employees must decide to apply to another job, submit an application, be interviewed, and, if offered a job, change a fundamental and regular part of that person's life.  By contrast, a customer of products may freely switch from one brand to another.  Second, the value of an employee varies from one potential employer to another.  An employee trained and experienced in the Papa John's System is more valuable to Papa John's stores than to other rival fast food brands.  The pay that employees can earn varies from one employer to another depending in large part on this varying employer-specific value.  A customer, on the other hand, does not pay more for Big Macs if the customer has not purchased a Big Mac before.  The prices of products are the same across customers, while the pay for work varies across employees.  Third, employers value loyalty.  An employee who switches employers regularly is a less valuable employee, and has less bargaining power in

negotiating pay.  Customers do not pay more for products if they switch brands often.  Fourth, employers regularly discourage or outright prohibit employees from sharing compensation information with each other.  The reason is that information is power: asymmetrical information allows the employer to pay its employees less.  Again, product markets are very different, with transparent and advertised prices.

38.     For example, a customer of Papa John's may easily decide to buy pizza from Domino's on a particular night, then try McDonald's for lunch the next day, go back to Papa John's for dinner that night, and so on, with no switching costs and no reputational injury.  An employee of Papa John's, on the other hand, has no such freedom.

39.     Thus, in many ways, employment relationships are much stickier and are far harder to change than customer relationships.   The strength of the employer/employee relationship provides employers with the power to suppress pay, particularly when they act in concert with their direct labor competitors to eliminate competition among them.

40.     Papa John's recognizes that retaining employees with brand-specific training is an important part of running a successful Papa John's restaurant.  As Papa John's noted in a recent annual report, "Our success depends in part on our and our franchisees' ability to recruit, motivate and retain a qualified workforce to work in our restaurants in an intensely competitive environment."   In the same report, Papa John's wrote that brand-specific training is "very important to delivering consistent operational execution."

41.     In the absence of a No-Hire Agreement, a franchise owner would face increased pressure to offer periodic pay increases, superior benefits, better working hours, or greater schedule flexibility to retain valued employees.

42.     Collusion among employers to refrain from hiring each other's employees restricts employee mobility.  This raises employers' power in the market at the expense of employees' bargaining power.  This is especially harmful to employees of Papa John's restaurants as those employees are frequently paid below a living wage,[15] and the marketable skills they acquire through their work at Papa John's restaurants primarily have value only to other Papa John's restaurants and do not transfer to other fast food restaurants or similar businesses.  *See* ¶¶85-90, below.

43.     Although unemployment in the United States is currently very low, wage growth has been slow.  A decade removed from the Great Recession, annual wage growth has remained stuck below 3%.[16]  A growing number of commentators have identified proliferating employer no-poaching agreements – including those used within franchise systems – as significant contributors to this stagnant wage growth.[17]

44.     In July 2018, Attorneys General from 11 States announced an investigation into no-poaching practices at a number of fast food franchise chains.  According to a release from then-Illinois Attorney General Lisa Madigan, Illinois is investigating no-poach agreements

---

[15]     In 2014, the average hourly wage of fast food employees is $9.09 or less than $19,000 per year for a full-time worker.  The poverty level of a family of four in the U.S. is $23,850. Patrick M. Sheridan, *Low Wage, health activists prepare McDonald's attack*, CNN MONEY (May 20, 2014) http://money.cnn.com/2014/05/20/news/companies/mcdonalds-meeting (last visited Feb. 18, 2019).

[16]     *See* Jana Kasperkevic and Kimberly Adams, *Here is the Truth About Wages that You Won't Hear from Trump*, MARKETPLACE (Feb. 2, 2018), https://www.marketplace.org/2018/02/02/economy/here-truth-about-wages-you-won-t-hear-trump (last visited Feb. 18, 2019).

[17]     *See, e.g.*, Rachel Abrams, *Why Aren't Paychecks Growing? A Burger Joint Clause Offers a Clue*, NEW YORK TIMES (Sept. 27, 2017), https://www.nytimes.com/2017/09/27/business/pay-growth-fast-food-hiring.html; Alan B. Krueger and Eric Posner, *Opinion: Corporate America Is Suppressing Wages For Many Workers*, NEW YORK TIMES (Feb. 28, 2018), https://www.nytimes.com/2018/02/28/opinion/corporate-america-suppressing-wages.html (last visited Feb. 18, 2019).

because those agreements "unfairly stop[] low-income workers from advancing and depress[] their wages." The state AGs demanded documents and information from franchisors about agreements not to compete for employees.

45. In July 2018, Washington Attorney General Bob Ferguson announced that seven franchisors had reached agreements to discontinue enforcement of no-hire and/or no-poach provisions and to take steps to remove such language from franchise agreements going forward. Papa John's was not among these franchisors.

46. In August 2018, Attorney General Ferguson announced that in order to avoid lawsuits, eight additional restaurant chain franchisors had agreed to discontinue enforcement of no-hire and no-poach provisions and to take steps to remove such language from franchise agreements going forward. Papa John's was, again, not among these franchisors.

47. In September 2018, Papa John's entered into an Assurance of Discontinuance with the Washington AG relating to the No-Hire Agreement evidenced in its pre-November 2017 franchise agreements. AG Ferguson announced on September 13, 2018, that among eight additional restaurant chain franchisors (bringing the total to 23), Papa John's had agreed to discontinue enforcement of No-Hire Agreement provisions and to take steps to remove the language from certain franchise agreements going forward. In particular, Papa John's agreed that it would, *inter alia*: (i) not include the no-solicit and no-hire provision in any of its future franchise agreements; (ii) not enforce the no-solicit and no-hire provision in any of its existing franchise agreements, and "will not seek to intervene or defend in any way the legality of any no-poach provision in any litigation in which a franchisee may claim third-party beneficiary status rights to enforce an existing no-poaching provision"; (iii) notify all of its Washington franchisees of its agreement with the Washington AG; and (iv) take steps to amend existing franchise

15

agreements **with entities in Washington** to remove any no-poaching provisions in existing franchise agreements.  The Assurance of Discontinuance notes that if any Washington franchise owner is unwilling to consent to the change to its franchise agreement, or demands other material changes which are unacceptable to Papa John's, then Papa John's will provide the name and address of the "resisting franchisee" to the Washington AG.

48.     According to the Assurance of Discontinuance, Papa John's had, in November 2017, "elected to remove the 'no-poaching provision' from its standard franchise agreements nationwide on a going forward basis."  Such a prospective change, if it was made at that time, still kept in place existing franchise agreements containing the "no-poaching provision" governing thousands of restaurants around the United States.  Papa John's made no assurance that it would attempt to remove the provisions from non-Washington franchise agreements already in existence.  Papa John's also made no assurance that it would notify non-Washington franchisees of its agreement with the Washington AG.  Finally, no action taken by AG Ferguson or by Papa John's resolves any civil liability to restaurant employees – within Washington or in any other state.

49.     As of January 2019, **50** franchisors had entered into legally binding agreements with the Washington AG to remove no-poaching provisions from franchise agreements.

### THE PAPA JOHN'S SYSTEM

50.     Founded in 1984, Papa John's is one of the world's largest restaurant chains, with more than 5,000 restaurants worldwide, serving customers daily in more than 44 countries.[18]  Papa John's primarily sells pizza, though its menu includes wings, sides, drinks, and desserts.

---

[18]     Annual Report at 3.

51.     Papa John's restaurants are owned and operated either by Papa John's itself (or its predecessor or affiliates), or by franchisees.  Papa John's revenues come from the rent, royalties, and franchise fees paid by franchisees, as well as from sales in its company-operated restaurants.

52.     As of 2017, approximately 2,739 of the 3,441 Papa John's U.S. restaurants (roughly 80%) were franchisee-owned and operated.[19]

53.     Papa John's licenses to franchisees the right to use the Papa John's brand and system in the operation of these independently owned franchise restaurants.  In addition to franchise fees and royalties, franchisees also pay other advertising and marketing fund contributions.

54.     Most of the company's franchisees are subject to a standard 10-year franchise license agreement.  The initial Papa John's franchise fee is currently $25,000.  In its 2017 Franchise Disclosure Document, Papa John's estimated that the total investment necessary to begin operation of a Papa John's franchise restaurant ranges from $130,120 to $844,420.

55.     Like other fast food chains in the industry, Papa John's restaurants maintain teams of staff in order to oversee operations and guide entry-level employees through daily responsibilities.

***Papa John's Franchisees: Independent Restaurant Owners Competing with One Another***

56.     Each franchise restaurant is operated by an entity that is a separate legal entity from Papa John's.  Each franchise is an independently owned and independently managed business.  In executing the Papa John's franchise agreement, a franchisee specifically agrees that neither it nor Papa John's will be "an agent, legal representative, subsidiary, joint venturer,

---

[19]     *Id.* at 6.

partner, employee, or servant of the other for any purpose whatsoever."[20]  Franchisees agree that there is no fiduciary relationship between the parties and that franchisees are and will remain "independent contractor[s]."[21]

57.    A franchisee agrees to "hold [itself] out to the public as an independent contractor, separate and apart from [Papa John's]."[22]  Franchisees also agree to identify themselves, in places conspicuous to the public and to employees, as "an independently owned and operated franchise."[23]  Franchisees must identify themselves as the owners of a franchise in conjunction with any use of the Papa John's proprietary marks, including on checks, invoices, receipts, letterhead, contracts, and all employment-related documents.[24]

58.    Franchisees are responsible for day-to-day operations, including employment matters.[25]  The Papa John's franchise agreement itself specifies that franchisees "have full responsibility for the conduct and terms of employment for [the franchisees'] employees and the day-to-day operation of [the franchisees'] business, including hiring, termination, pay practices and any other employment practices."[26]

59.    The Papa John's franchise agreement elsewhere specifies that Papa John's "will have no responsibility for the day-to-day operations of the Restaurant or the management of your

---

[20]    FA, ¶21(a).

[21]    *Id.*

[22]    *Id.*

[23]    FA, ¶7(d).

[24]    *Id.*

[25]    Annual Report at 14.

[26]    FA, ¶11(c).

business, . . . [and] no responsibility for or control or supervision of your employees or your employment practices."[27]

60.     Papa John's franchisees and restaurants compete with each other.  In its 2017 Franchise Disclosure Document (hereafter, "FFD"), Papa John's discloses to prospective franchisees "you may face competition from other Papa John's franchisees, from restaurants that we own, or from other channels of distribution or competitive brands that we control."[28]

61.     Papa John's tells franchisees – and they acknowledge in executing the franchise agreement – that franchisees "will compete with other Papa John's restaurants, that are now, or that may in the future be, located near or adjacent to your Territory."[29]  Papa John's informs franchisees (and they acknowledge) that other Papa John's restaurants may solicit or make sales within the franchisee's territory, and that Papa John's has no duty to "protect" the franchisee from any such sales, solicitations, or attempted sales.[30]

62.     "Territories" are defined narrowly in Papa John's franchise agreements, and restaurants are commonly located close enough together that they would normally compete for employees.  A Territory is one-and-one-half mile radius around the restaurant location (or a one-half mile radius in certain densely populated urban areas) within which Papa John's will not locate, or license another to locate, a Papa John's restaurant.[31]

---

[27]     FA, ¶21(b).

[28]     FDD, Item 12.

[29]     FA, ¶5(a).

[30]     *See id.*

[31]     The average travel time to work in the United States is approximately 26.6 minutes.  Jeff Desjardins, *Visualizing the Average Commute Time in U.S. States and Cities*, VISUAL CAPITALIST, (Apr. 1, 2018), https://www.visualcapitalist.com/average-commute-u-s-states-cities/.

*The Agreement Not to Compete for Employees*

63.     Notwithstanding that each franchise is an independently owned and operated business that competes with other franchises and with company-owned restaurants, and notwithstanding that each has "full responsibility for the conduct and terms of employment for [its] employees and the day-to-day operation of [its] business, including hiring, termination, pay practices and any other employment practices,"[32] Papa John's franchisees and Papa John's have agreed not to compete with each other with respect to hiring employees. This No-Hire Agreement is evidenced by, among other things, explicit contractual terms in the franchise agreements.

64.     In particular, each franchisee who signed a new (or renewed) franchise agreement beginning no later than 2010 and continuing through at least November 2017, agreed not to, "during the Term and for a period of one year after expiration or termination of the Franchise, employ or seek to employ any person who is employed by [Papa John's], [Papa John's] Affiliates or by any of [Papa John's] franchisees, or otherwise directly or indirectly solicit, entice or induce any such person to leave their employment."[33]

65.     In executing the franchise agreement, franchisees contractually agree that any violation of the No-Hire Agreement is a non-curable default of the franchise agreement

---

[32]     FDD, Item 11.

[33]     FA, ¶16(e). As noted above, as a part of the September 12, 2018 Assurance of Discontinuance that Papa John's entered into with the Washington AG, Papa John's asserted that it "elected to remove" the no-solicit and no-hire provision from new franchise agreements "in November 2017." It did not, however, remove the provision from the existing franchise agreement that time. Papa John's agreed with the Washington AG in September 2018 to attempt to amend existing agreements **with entities in Washington** in order to remove any no-poaching provisions. It has never agreed to do so with respect to existing non-Washington franchise agreements. And while the standard restaurant franchise agreement appended to Papa John's 2018 Franchise Disclosure Document (dated March 9, 2018) no longer contains the no-poaching provision; the provision remains in the 2018 franchise agreement for "Non-Traditional Restaurants."

providing grounds for termination upon notice.[34]  A violation of the No-Hire Agreement would thus risk the franchisee's initial franchise fee and its entire investment in the business.

66.     Franchise termination carries additional risks.  Franchisees agree to injunctive relief and specific performance obligations, and also agree to pay Papa John's "all damages, costs and expenses, including reasonable attorneys' fees" incurred by Papa John's in obtaining injunctive or other relief for the enforcement of the agreement.[35]  Franchisees also covenant that for a period of two years after termination (or expiration) of the franchise, they will not engage "directly or indirectly" in any "Competitive Business" (as defined in the agreement) within a 10-mile radius of either the restaurant or any location that operates another Papa John's restaurant.[36]

67.     Violation of the No-Hire Agreement thus subjects the franchisee to potential non-curable default and termination of the franchise, attorneys' fees and costs, and the damage of a covenant to not compete against Papa John's for two full years after termination.

68.     Papa John's franchises, like other franchises, are made available on standardized terms.  A franchisee who enters into a Papa John's franchise agreement knows that the same terms it has agreed to also apply to other franchisees.  Moreover, the Papa John's FDD identifies all other franchisees by name and address.  Therefore, each franchisee knows that all other franchisees have agreed to the No-Hire Agreement.

69.     One of the standard terms in Papa John's franchise agreements with all its franchisees (at least until November 2017) is the No-Hire Agreement referred to above.

70.     Even though Papa John's agreed to remove the no-solicit, no-hire language from its standard restaurant franchise agreements signed either after November 2017, or signed on or

---

[34]     FA, ¶19(b).

[35]     *Id.*, ¶20(a)(ii).

[36]     *Id.*, ¶20(a)(x).

after March 9, 2018, thousands of Papa John's franchise restaurants were already (and remain) in existence and operating under older versions of the franchise agreement that contain the restraint. The restraint provision also continues to exist in non-traditional store franchise agreements signed even after March 9, 2018.

71.     The No-Hire Agreement is not in the independent interest of Papa John's franchisees and restaurants if acting unilaterally.  Employees are critical to the success of Papa John's franchises and restaurants.  A significant component of making the franchise profitable is hiring qualified, motivated, and superior employees.  Therefore, it is in the independent interest of each Papa John's franchisee to compete for the most talented and experienced employees.

72.     The No-Hire Agreement artificially restricts franchisees' ability to hire employees consistent with their own unilateral economic interests.  By acting in concert, however, they also protect themselves from having their own employees poached by other franchises that see additional value in those employees, such as their training, experience and/or work ethic.  This allows franchisees and Papa John's to retain their best employees without having to pay competitive wages to these employees or compete over working conditions and promotion opportunities.

73.     Most importantly, the No-Hire Agreement does not serve restaurant employees because it does not incentivize Papa John's or franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor.  It also dis-incentivizes employees from performing their best because franchisees do not have to offer compensation increases or improved benefits to retain the best employees.  Competition among employers helps actual and potential employees through higher wages, better benefits, or other employment terms.

74.     Papa John's franchisees and company-owned restaurants have a shared interest in keeping labor costs low because  the cost of labor directly affects the profitability of a Papa John's restaurant.  By agreeing to not compete for labor, franchisees act against their unilateral self-interest by not attracting the best employees to operate their business, but serve their shared interest in keeping labor costs low.

75.     But for the No-Hire Agreement, each Papa John's franchise would be its own economic decision-maker with respect to hiring, firing, staffing, promotions, and employee wages.  But for the No-Hire Agreement, each Papa John's franchise would compete with Papa John's and with each other for the best-performing employees.

***Other Evidence of Papa John's System-Wide Commitment to Depressing Employee Wages and Mobility and of the Unlawful Agreement***

76.     Low wages are consistent, even if not uniform, across the Papa John's system. This has allowed Papa John's owners and executives, and Papa John's franchisees, to become wealthy while full-time, hardworking employees often must resort to government benefits just to put food on their own tables.  A significant reason for this is that Papa John's has orchestrated an agreement among franchisees to stifle employee wages and mobility.

77.     The average fast-food worker in the United States makes approximately $19,900 per year, while the average fast-food CEO earns $1.2 million per year.  Papa John's long-time CEO's compensation was even larger, totaling $2.8 million in 2017.

78.     If Papa John's and franchisees had to either pay and promote good employees, or lose them to competitor locations, they would be forced to pay competitive wages and provide competitive promotion opportunities.  However, because of the No-Hire Agreement, and because the education, training, and experience within the Papa John's system are unique to Papa John's and not transferrable to other restaurants, Papa John's and franchisees do not have to compete

with other Papa John's franchisees, and do not have to compete with non-Papa John's businesses for their employees.

79. Hart Research Associates surveyed 1,088 fast food workers in 10 major metro areas, and found that 89% of fast food workers have experienced wage-theft, in multiple forms, at their fast food job. Wage theft occurred through forcing employees to work off the clock, not paying workers for all hours worked, denying breaks, and failing to pay for overtime.[37]

80. From 2007 to 2011, fast food workers in the U.S. drew an average of $7 billion of public assistance annually because of low wages.

81. Papa John's is a member of the American Pizza Community ("APC"), a powerful arm of the food industry lobby specifically speaking for "Big Pizza." The APC coalition was founded in 2010 and includes many of the nation's other largest pizza retailer chains, including Domino's, Little Caesars, and Pizza Hut – each of which, like Papa John's, is a franchisor. Among other causes, the APC has been an active critic of the Department of Labor's final ruling on overtime eligibility in 2016. That ruling doubled the overtime salary threshold from $23,660 to $47,476, guaranteeing overtime pay for millions of additional workers. The APC previously opposed a minimum wage hike in California and lists labor employment policies as among the top issues on its website.

82. Additional evidence also supports the notion that Papa John's and its franchisees have agreed not to hire each other's employees and had means to police that agreement.

83. Papa John's employee application form includes a specific inquiry into whether the candidate has previously been employed at a Papa John's restaurant. The application

---

[37] *See* Hart Research Associates, *Key Findings for Survey of Fast Food Workers* (April 1, 2014), http://big.assets.huffingtonpost.com/NationalWageTheftPollMemo.pdf (last visited Feb. 18, 2019).

requests information about the dates and location of any such employment. The potential employer uses this information to quickly determine whether the No-Hire Agreement is implicated for an applicant.

84.     In addition to their actual understanding of and shared motivation to enforce the No-Hire agreement Papa John's franchisees also have abundant opportunity to communicate about and coordinate their agreement. Papa John's holds regular or annual business conferences or conventions, at which franchisees have an opportunity to meet and discuss their No-Hire Agreement. In addition, the Papa John's Franchise Association also conducts regular meetings or conferences of franchisees.

***Employment with Non-Papa John's Brands Is Not a Reasonable Substitute for Papa John's Employees***

85.     Training, education, and experience within the Papa John's system are not transferrable to other restaurants for a number of reasons.

86.     Papa John's characterizes its restaurants as being part of a "unique system which includes . . . special recipes and menu items; . . . software and programs; standards, specifications and procedures for operations systems for communicating with [Papa John's], suppliers and customers; procedures for quality control; training and assistance; and advertising and promotional programs[.]"[38]

87.     All Papa John's restaurants, whether owned by Papa John's or its franchisees, utilize Papa John's proprietary operations systems, including certain mandatory specifications, standards, and operating procedures set forth in Papa John's manuals. Papa John's treats all information in the manuals, policy and procedure statements, and other notices as confidential

---

[38]     FDD, Item 1.

information and trade secrets.  Experience and training with these systems is of little value to other restaurants.

88.     Papa John's restaurants and franchisees utilize a specified "Information System" and "Designated Software."  These may include the brands, types, makes and/or models of communications and computer systems, hardware, and network devices Papa John's requires, along with point-of-sale systems, information storage, retrieval and transmission systems and security systems.  The Designated Software includes proprietary programs used only in Papa John's restaurants.  The Information System is proprietary to Papa John's.  Experience with these systems is of little value to other brand restaurants.

89.     Papa John's restaurants and franchisees use approved or mandatory suppliers and vendors affiliated with Papa John's.  Experience with these vendors is of little value to other restaurants.

90.     Employees trained and experienced in these systems are more valuable to Papa John's locations than other potential employers.  As a result, but for the No-Hire Agreement, Papa John's employees would be able to use competition among Papa John's stores to improve their pay and working conditions.

## **ANTITRUST INJURY**

91.     But for the No-Hire Agreement, Papa John's restaurants (whether corporate-owned or franchisee-owned) would compete with each other for employees.

92.     Plaintiffs and the Class are current of former employees of Papa John's.  They supply or supplied labor to Papa John's restaurants (whether corporate-owned or franchisee-owned).

93.     By agreeing to and enforcing the No-Hire Agreement, Papa John's and its franchisees unlawfully restrained  competition for the supply of employees between all Papa John's restaurants.  They did so to artificially depress wages and benefits and reduce worker mobility.

94.     The proximate and foreseeable results of the No-Hire Agreement was to deprive Plaintiffs and the Class of higher wages, better benefits and working conditions, and greater job choice and mobility that free and open competition promotes.

95.     Depressed wages and employment benefits resulting from employers' agreement not to compete with each other in the labor market is injury of the type the antitrust laws were intended to prevent and flow from that which makes the No-Hire Agreement unlawful.

96.     Papa John's anticompetitive actions had no legitimate business justifications and did not have any pro-competitive benefits.

97.     Papa John's is jointly and severally liable for the acts of non-Defendant co-conspirator franchisees.

98.     Papa John's therefore caused antitrust injury to Plaintiffs and the Class.

## CLASS ACTION ALLEGATIONS

99.     Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to Federal Rules of Civil Procedure, Rules 23(a), 23(b)(2), and/or 23(b)(3).  The Class is defined as:

> All persons who were employed at a Papa John's restaurant located in the United States between January 1, 2010 through the present.

100.     Excluded from the Class are Defendants, their current and former affiliates, directors, officers, and employees who work or worked for Defendants in a capacity other than as a restaurant employee, Papa John's franchise owners, and the Court.  Plaintiffs reserve the

right to modify, change, or expand the Class definition during discovery and upon further investigation.

101.    Numerosity:  Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Papa John's restaurants in the U.S.  While the exact number and identities of the individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, based on Papa John's public statements that the Class members contain tens of thousands of members.

***Existence and Predominance of Common Questions of Fact and Law:  Common questions of fact and law exist as to all members of the Class.***

102.    These questions predominate over the questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, whether:

    a.  Defendants orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

    b.  Defendants violated the Sherman Antitrust Act, 15 U.S.C. §§1, *et seq.*;

    c.  Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

    d.  Plaintiffs and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

    e.  the amount and nature of such relief to be awarded to Plaintiffs and the Class.

103.    Typicality:  Plaintiffs' claims are typical of the claim of the Class inasmuch as Plaintiffs are or were a Papa John's restaurant employee and each member of the Class either was or is a Papa John's restaurant employee subject to the same agreements and rules as Plaintiffs.  Further, Plaintiffs and all the members of the Class sustained the same monetary and

economic injuries of being subjected to artificial depression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiffs seek relief against Defendants for themselves and all absent Class members.

104.    Adequacy:  Plaintiffs are adequate representatives because their interests do not conflict with the interest of the Class that they seek to represent, they have retained counsel which are competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

105.    Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class.  The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.   Individualized litigation increases the delay and expense to all parties and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

106.    Defendants have acted, and refuse to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

## **FRAUDULENT CONCEALMENT**

107.    Plaintiffs and the Class members had neither actual nor constructive knowledge of the unlawful No-Hire Agreement orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiff or the Class have put them on notice of the conspiracy.  Any statute of limitations is therefore tolled by Defendants' intentional concealment of their No-Hire Agreement.  Plaintiffs and the Class members were deceived regarding Defendants' collusion to depress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

108.    Neither Defendants nor franchisees disclosed the existence of the No-Hire Agreement to Plaintiffs or the Class members.

109.    Papa John's public statements conceal the fact that it orchestrated and engaged in a No-Hire Agreement among itself and its franchisees.

110.    In describing its work culture to employees and prospective employees, Papa John's says "Our biggest ingredients are our people."[39]  Papa John's tells prospective employees that "We believe in rewarding the hard work and inspiring ideas of our associates, at all levels throughout our organization.  And we offer many ways to grow."[40]

111.    Papa John's tells prospective employees that "[a]t Papa John's, it's possible to start with just your talent and become something greater.  Here, it's not uncommon for a team member to transition into management . . .  And as you grow, we'll be there to encourage you, recognize you and provide the resources you need to accomplish your professional

---

[39]    *See* https://jobs.papajohns.com/creative/culture (last visited Feb. 18, 2019).

[40]    *See* http://www.papajohnshiring.com/ (last visited Feb. 18, 2019).

aspirations."[41]  These statements conceal the fact that Papa John's and its franchisees have in fact colluded to depress the wages and mobility of restaurant employees.

112.    The hiring section of Papa John's website directs prospective employees to a "Search Jobs" utility that identifies particular openings available at specific franchise and store locations in the geographic area selected by a prospective employee.  On its website, Papa John's also informs visitors that "employees of franchised restaurants are not employees of Papa John's corporate and Papa John's corporate does not set or control the terms of employment at its franchised restaurants.  Employment terms, including pay, hours and benefits will be determined by the franchisee-owner of the franchised restaurant and may not be the same as those offered by Papa John's corporate."[42]  These statements highlight the supposed independence of franchisee-employers and conceal the existence of the collusive No-Hire Agreement.

113.    As alleged above, each franchisee similarly informs its employees that it has "full responsibility for the conduct and terms of employment for [its] employees and the day-to-day operation of [its] business, including hiring, termination, pay practices and any other employment practices."[43]  Franchisees display notices at "conspicuous" locations informing employees that the franchisee, and not Papa John's, is the employer.  Franchisees identify themselves to employees as "independently owned and operated," and identify themselves as such in conjunction with the use of Papa John's marks and in employment-related documents. These actions also conceal the existence of the collusive No-Hire Agreement.

114.    In its Code of Ethics and Business Conduct, Papa John's asserts that it "complies with all applicable labor and employment laws and regulations," and acknowledges that

---

[41]    *See* https://jobs.papajohns.com/creative/careergrowth (last visited Feb. 18, 2019).

[42]    *See* https://jobs.papajohns.com (last visited Feb. 18, 2019).

[43]    FA, ¶11(c).

"[a]ntitrust laws prohibit agreements among companies that fix prices, divide markets, limit production or otherwise interfere with the free marketplace."[44]   Papa John's asserts that its Officers, Directors, and Team Members all "have the right to expect Papa John's to conduct its business lawfully, responsibly and with the highest moral and ethical standards."[45]   These statements conceal the existence of the No-Hire Agreement.

115.   Plaintiffs and the Class could not have discovered the existence of this unlawful conduct through reasonable inquiry.   No member of the Class was informed that the Papa John's No-Hire Agreement applied to their employment at a Papa John's store.   The Class did not receive a copy of the franchise agreements memorializing the No-Hire Agreement; the Class was required to acknowledge its existence; no member of the Class was a party or privy to the No-Hire Agreement.

116.   Plaintiffs and the Class would thus have no reason to know of the No-Hire Agreement evidenced by franchisees' contractual undertakings with Defendants.   Plaintiffs and the Class are not parties to franchisees' contractual franchise agreements with Papa John's.   Nor are these contracts routinely provided to Plaintiffs.

117.   Although Defendants provide their form franchise documents to state regulators, franchise disclosure documents and form franchise agreements are made available by Defendants only upon request by prospective franchisees.   Obtaining Defendants' historic franchise disclosure documents and form franchise agreements is even more difficult.

118.   In order to obtain Defendants' current franchise disclosure documents and form franchise agreement from Papa John's, a prospective franchisee must submit an application (with supporting documents) seeking to open a franchise.   Only after Papa John's reviews the

---

[44]      *See* Code of Ethics at 8.

[45]      *Id.* at 1.

application to ensure that the franchisee meets initial qualifications does Papa John's provide the franchise disclosure document.   Prospective franchisees are told that in order to qualify for consideration, they should have a minimum of $75,000 in cash or liquid assets, a net worth of $250,000 or greater, and have the ability to obtain financing up to $275,000 to cover the cost of opening a location.  Even these are called "minimum requirements," which "do not represent the total potential costs to open and operate one or more Papa John's units."[46]

119.    Defendants' franchise disclosure documents and form franchise agreements are not routinely provided to employees (or prospective employees) of restaurants, whether by Defendants, by franchisee employers, by regulators, or by anyone else.   Historic franchise disclosure documents and form franchise agreements would never be available to franchisee employees or prospective employees.

120.    Even upon entering into the Assurance of Discontinuance with the Washington AG, Papa John's continued to deny that No-Hire Agreement evidenced by the provisions of its franchise agreements was in violation of any law.

121.    Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiffs and the Class members had no reason to know Defendants had conspired to depress compensation or employee mobility.

122.    As a result of Defendants' fraudulent concealment of the conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiffs and the Class members have as a result of the anticompetitive and unlawful conduct alleged herein.

---

[46]    *See* https://www.papajohns.com/franchise/franchise-ownership-process.html (last visited Feb. 18, 2019).

## CLAIMS FOR RELIEF

### COUNT I: VIOLATIONS OF SECTION 1 OF THE
### SHERMAN ACT, 15 U.S.C. §1, *et seq.*

123.    Plaintiffs, on behalf of themselves and all others similarly situated, re-allege and incorporate by reference the allegations contained in the preceding and succeeding paragraphs of this Complaint, and further alleges against Defendants as follows:

124.    Beginning no later than 2010, Defendants orchestrated, entered into, and engaged in the No-Hire Agreement, which is an unlawful agreement in restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

125.    Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition with and among Papa John's franchisees, which unfairly depressed employee wages, and unreasonably restrained trade.

126.    Defendants' conduct included concerted efforts, actions and undertakings among the Defendants and franchise owners with the intent, purpose and effect of: (a) artificially depressing the compensation of Plaintiffs and the Class members; (b) eliminating competition with and among franchise owners for employees; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

127.    Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

128.    Defendants' conduct in furtherance of the No-Hire Agreement was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

129.    Plaintiffs and the Class members have received lower compensation, including wages, from Papa John's and Papa John's franchisees than they otherwise would have received

in the absence of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

130.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of Section 1 of the Sherman Act.

131.    In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor. Specifically, by agreeing not to hire each other's employees, Defendants reduced competition for employees.  The reduction of competition allows Papa John's restaurants to pay their employees an artificially depressed wage.

132.    Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

133.    As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiffs and the Class members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

134.    Plaintiffs and the Class members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. §26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## REQUEST FOR RELIEF

Plaintiffs and the Class respectfully request that the Court:

A.     Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.     Appoint Plaintiffs as the representatives of the Class and Interim Co-Lead Class Counsel as Class Counsel;

C.     Declare that Defendants' actions as set forth in this Complaint violate the law;

D.     Award Plaintiffs and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, *et seq.*, to be trebled in accordance with those laws;

E.     Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiffs and the Class members are entitled;

F.     Grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G.     Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

H.     Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

I.     Award pre-judgment and post-judgment interest on such monetary relief;

J.     Award reasonable attorneys' fees and costs; and

K.      Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 19, 2019

       s/ Walter W. Noss
Walter W. Noss (*pro hac vice*)
Stephanie A. Hackett (*pro hac vice*)
Sean C. Russell (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
600 West Broadway, Suite 3300
San Diego, CA 92101
T: (619) 233-4565
wnoss@scott-scott.com
shackett@scott-scott.com
sean.russell@scott-scott.com

Michelle E. Conston (*pro hac vice*)
SCOTT+SCOTT ATTORNEYS AT LAW LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
T: (212) 223-6444
mconston@scott-scott.com

Derek Y. Brandt (*pro hac vice*)
Leigh M. Perica (*pro hac vice*)
MCCUNE WRIGHT AREVALO, LLP
101 West Vandalia Street, Suite 200
Edwardsville, IL 62025
T: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com

Richard D. McCune (*pro hac vice*)
Michele M. Vercoski (*pro hac vice*)
MCCUNE WRIGHT AREVALO, LLP
3281 East Guasti Road, Suite 100
Ontario, CA 91761
T: (909) 557-1250
rdm@mccunewright.com
mmv@mccunewright.com

Dean M. Harvey (*pro hac vice*)
Anne B. Shaver (*pro hac vice*)
Yaman Salahi (*pro hac vice*)
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
T: 415-956-1000
dharvey@lchb.com
ashaver@lchb.com
ysalahi@lchb.com

Vincent Briganti (*pro hac vice*)
Christian Levis (*pro hac vice*)
Roland R. St. Louis III (*pro hac vice*)
Amir Alimehri (*pro hac vice*)
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
T: (914) 997-0500
vbriganti@lowey.com
clevis@lowey.com
rstlouis@lowey.com
aalimehri@lowey.com

*Interim Co-Lead Counsel*

John Radice (*pro hac vice*)
Radice Law Firm
475 Wall Street
Princeton, NJ 08540
T: (646) 245-8502
jradice@radicelawfirm.com

*Interim Counsel*

Jennifer A. Moore
MOORE LAW GROUP, PLLC
1473 South 4th Street
Louisville, KY 40208
T: (502) 717-4080
jennifer@moorelawgroup.com

*Liaison Counsel*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2019, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

 s/ Walter W. Noss
Walter W. Noss
SCOTT+SCOTT ATTORNEYS AT LAW, LLP
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
Email: wnoss@scott-scott.com
