UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| IN RE: PAPA JOHN'S EMPLOYEE AND FRANCHISEE EMPLOYEE ANTITRUST LITIGATION | Case No.: 3:18-cv-00825-BB-RSE |

**DECLARATION OF LIN Y. CHAN IN SUPPORT OF UNOPPOSED MOTION FOR AND MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND TO DIRECT NOTICE TO THE PROPOSED SETTLEMENT CLASS**

I, Lin Y. Chan, hereby declare:

1. I am a Partner at the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), counsel for Plaintiff Ashley Page and the proposed Class. I make this Declaration in support of Ms. Page's Unopposed Motion for and Memorandum of law in Support of Preliminary Approval of Class Action Settlement and to Direct Notice to the Proposed Settlement Class. I have personal knowledge of the facts herein and, if called upon to testify to those facts, I could and would do so competently.

**Litigation Efforts**

2. Plaintiff's Counsel vigorously litigated this case. In December 2018, Plaintiffs Jay Houston, Ashley Page, and Jamiah Greer filed their respective class action complaints against Defendants Papa John's International, Inc. and Papa John's USA, Inc. ("Defendants" or "Papa John's").

3. On February 19, 2019, Plaintiffs filed a Consolidated Amended Complaint ("CAC") in which they alleged that Defendants violated the Sherman Antitrust Act by "orchestrat[ing] an agreement between and among Papa John's restaurant franchisees, pursuant

-1-

to which the franchisees agreed not to hire or solicit each other's employees or Papa John's employees." CAC ¶ 1. Because of this unlawful agreement (the "No-Poach Agreement"), Plaintiffs alleged that they suffered depressed wages and benefits and diminished employment opportunities. *Id.* ¶ 2.

4. On October 21, 2019, the Court largely denied Defendants' motion to dismiss. ECF No. 90.

5. On May 11, 2020, Magistrate Judge Regina S. Edwards directed the Parties to discuss settlement. Those settlement discussions were unsuccessful.

6. Thereafter, the Parties engaged in extensive discovery, including numerous discovery meet-and-confers. They have exchanged over 140 formal letters and many more emails as part of the meet-and-confer process concerning discovery. Telephonic meet and confers were often held on a weekly or bi-weekly basis.

7. By the time of Settlement, Defendants produced over 400,000 pages of documents regarding key issues necessary to value the case, such as liability and enforcement evidence and substantial evidence concerning Papa John's internal compensation structures, organizational charts, job titles and job descriptions, and employee payroll data for estimating damages. Defendants also produced extensive compensation and other human resources-related data totaling approximately 90 gigabytes, which Plaintiff's Counsel analyzed with the help of prominent economic experts. These experts analyzed the documents and data to estimate the extent to which the alleged misconduct suppressed Class pay. Experts spent approximately 960 hours analyzing data and documentary evidence in support of Plaintiff's case. That estimate informed later settlement discussions with Papa John's.

8. Plaintiffs produced over 7,000 documents, and the Parties collectively took ten depositions, including those of Plaintiff Ashley Page, Papa John's Vice President of Operations, its General Counsel, its Senior Counsel, three Franchise Business Directors, a General Manager, its Senior Director of Human Resources, and its Vice President of Talent Management.

9. In total, between 2019 and 2022, Plaintiff's Counsel dedicated thousands of hours to discovery, took or defended ten fact witness depositions, including Plaintiff's, and extensively negotiated the contours of their Rule 30(b)(6) deposition, which was set to move forward before the Parties engaged in settlement discussions in earnest.

10. Although Ms. Page and her Counsel were prepared to litigate through class certification, summary judgment, and trial, Ms. Page and her Counsel determined that the proposed Settlement would best serve the interests of the Class by guaranteeing compensation and injunctive relief related to the harms of the No-Poach Agreement, while avoiding the substantial risks attendant to further litigation.

## Mediation Process

11. During discovery, two courts denied class certification in no-poach franchise cases involving the fast food industry, *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021) ("*McDonald's*"), and *Conrad v. Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2021 WL 3268339 (S.D. Ill. July 30, 2021) ("*Jimmy John's*").

12. The Parties agreed to explore settlement and engaged in extensive, arm's-length negotiations facilitated by JAMS mediator Barbara Reeves, including a full-day mediation held in California on February 10, 2022, a follow-up video-conference mediation session with Ms. Reeves on March 4, 2022, and multiple follow-up phone calls with Ms. Reeves.

13. Both sides were represented by experienced and highly-skilled counsel, had substantial documentary evidence at their disposal enabling them to be well-informed of the facts, and were cognizant of their respective strengths and weaknesses and the substantial risks, delays, and expense of ongoing class action litigation.

14. Members of Plaintiff's Counsel have litigated numerous class action no-poach cases and Defense Counsel has similarly defended against such cases, giving both sets of counsel the ability to determine the strengths and weaknesses of their respective cases.

15. Over the next four months, the Parties negotiated at length over the specific terms of the deal, including but not limited to the ultimate monetary amount to be distributed to the Class, the form of notice, and the nature of the injunctive relief.

16. The Parties did not make the Settlement contingent on the amount of attorneys' fees—indeed, Plaintiff's Counsel agreed to an upper limit to maximize Class Member recovery—and there is no reversion of unused funds to Defendants.

17. The Settlement was executed on July 11, 2022.

### Relief for the Class

18. The average Class Member recovery will depend on the claims rate.

19. Assuming an (unlikely) 100% claims rate—each Class Member's gross recovery will average approximately $33.04, with the majority of Class Members receiving between $7.90 and $77.22. This gross amount would be reduced by the amount of any attorneys' fees and costs, claims administration costs, and service awards awarded by the Court.

20. If 20% of Class Members make claims, each Class Member's gross recovery will average $165.22, with the majority of Class Members receiving between $29.55 and $288.84.

This gross amount would be reduced by the amount of any attorneys' fees and costs, claims administration costs, and service awards awarded by the Court.

21. If there is a lower claims rate, each Class Member's gross recovery will increase. If funds remain in the Net Settlement Fund after it is distributed to all approved claimants, the Claims Administrator will continue to distribute the funds *pro rata* until either (i) all Approved Claimants are paid 25% of their total approved claimant compensation—which exceeds maximum estimated treble damages—and/or (ii) no funds remain in the Net Settlement Fund. *See* Ex. A ("Settlement") ¶ 4.6(d), *infra*.

22. In the opinion of Plaintiff's Counsel, this relief is fair and reasonable for the Class given the risks of continued litigation. Ms. Page brought complex claims premised on legal theories currently being tested in numerous courts. These risks are reflected in the decisions in *McDonald's* and *Jimmy John's*, which, as here, were cases brought on behalf of fast food employees challenging no-poach agreements. *See McDonald's*, 2021 WL 3187668, at *7-13 (denying class certification); *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2022 WL 2316187 (N.D. Ill. June 28, 2022) (granting judgment on the pleadings); *Jimmy John*'s, 2021 WL 3268339, at *9-10 (denying class certification). Although the *McDonald's* decision may be reversed on appeal, both cases involved different facts, and Plaintiff's Counsel believes the cases were wrongly decided as a matter of law, the decisions underscore the risk of continued litigation, which favors this Settlement. As counsel for plaintiffs in both *McDonald's* and *Jimmy John's*, it is my professional opinion that this result is fair, reasonable, and adequate.

### The Notice and Claims Administrator

23. Ms. Page proposes A.B. Data, Ltd. ("A.B. Data") as Notice and Claims Administrator.

24. Plaintiff's Counsel engaged in a competitive bidding process that included three competing bids. Plaintiff's Counsel selected A.B. Data after evaluating each proposal because A.B. Data was the most competitive, taking into consideration the services to be provided and Plaintiff's Counsel's prior experiences with the administrator.

25. A.B. Data estimates a total cost of approximately $250,000 to $300,000 to administer the Settlement. This cost covers (1) using personal identifying information provided by Defendants to locate email addresses for all Class Members; (2) sending email notice, which will include Notice of the Class Action Settlement, a link to a website containing information about the Settlement Agreement (including the long-form notice of the Settlement Agreement, the operative complaint, and the preliminary and final approval motions when available) and the ability to fill out a Claim Form; (3) maintenance of said website, which will also display a toll-free number that Class Members can call with questions about the Settlement or their eligibility to receive a monetary payment; (4) sending out short-form notices, formatted as a postcard, to all Class Members for whom the Claims Administrator is unable to find an email address; and (5) various mechanisms to ensure proper dissemination of the notices.

## The Claims Process

26. The Settlement will be distributed according to the allocation plan delineated in the Settlement Agreement. Settlement ¶¶ 4.6, 4.10. The Claims Administrator will first calculate the Net Settlement Fund amount by subtracting any court-approved award of attorneys' fees and costs, class representative service awards, and settlement administration costs from the $5 million Gross Settlement Fund. *Id.* ¶¶ 4.5, 4.6. Each approved claimant's share will be based on that Class Member's total compensation during the Class Period, using data supplied by the Defendants. *Id.* ¶ 4.6. To calculate each approved claimant's settlement share, the Claims Administrator will divide the approved claimant's total compensation during the Class Period by

the total class compensation to generate the applicable fraction. *Id.* The Claims Administrator will then multiply the fraction by the Net Settlement Fund.[1] *Id.*

28. The claims process itself is designed to maximize Class Member participation and eliminate unnecessary burdens. The Claim Form, which will be available online at a webpage provided in the Class Notice, requests simple personally identifying information (name, address, email address, etc.) and a signature. *See* Settlement, Ex. 1. It also explains that, upon a finding of Settlement eligibility, payment will be made digitally (through a variety of options, such as PayPal or a digital credit card) or the Class Member can request a paper check. *Id.*

### The Notice Plan

28. Under the Settlement Agreement, Class Members will be advised of the proposed Settlement through direct individual notice (email or First-Class Mail). Settlement ¶ 6.2.

29. Defendants represented to Plaintiff's Counsel that they do not have any email addresses for employees in their data and any such email addresses would have to be obtained through the use of a credit reporting agency.

30. The email notice will include Notice of the Class Action Settlement, a link to a website containing information about the Settlement Agreement (including the long form notice of the Settlement Agreement, the operative complaint, and the preliminary and final approval motions when available) and the ability to fill out a Claim Form. Settlement ¶ 6.2. The website will also display a toll-free number that Class Members can call with questions about the Settlement or their eligibility to receive a monetary payment. *Id.* If the Claims Administrator is

---

[1] If funds remain in the Net Settlement Fund after it is distributed to approved claimants, the Claims Administrator will continue to distribute the funds *pro rata* using this allocation formula until either (i) all Approved Claimants are paid 25% of their total approved claimant compensation—which exceeds maximum estimated treble damages—and/or (ii) no funds remain in the Net Settlement Fund. Settlement ¶ 4.6(d). If any funds remain in the Net Settlement Fund after that point, they will be distributed to a charity under the *cy pres* doctrine. *Id.* ¶ 4.7.

unable to find an email address for any Class Member, the Administrator will use Class Members' last known addresses (provided by Defendants) to effectuate Short-Form Notice, formatted as a postcard.

31. The Claims Administrator will take additional steps to ensure proper dissemination.

32. In the event the Claims Administrator determines that direct notice is unlikely to reach eighty percent (80%) of the Class Members or the Court otherwise finds that the direct notices are insufficient, the Parties will meet and confer regarding publication notice with disputes to be resolved by mediator Barbara Reeves.  Settlement ¶ 6.5.

33. With respect to the Notice itself, the Notice clearly describes the nature of the action, the Class definition, the legal issues, Class Members' right to enter an appearance through an attorney, Class Members' right to request exclusion, how to make a claim or object to the Settlement, and the binding effect of a class judgment.  Settlement, Ex. 3.

34. The proposed Notice will also state the date and time of the fairness hearing, the formula for calculating each Class Member's recovery, and information about the attorneys' fees and expenses and class representative service awards that will be requested.  *Id.*

### Ms. Page's Role

35. Ms. Page engaged in written responses to interrogatories, searched for and produced documents, and traveled out-of-state to sit for a seven-hour deposition.

36. Ms. Page spent approximately 100 hours locating documents, reviewing discovery requests and responses, preparing for her deposition, and traveling and sitting for her deposition.

37. Ms. Page intends to seek a modest $5,000 service award for her contributions to the case.

### Plaintiff's Counsel

38.     Plaintiff's Counsel have considerable experience in successfully prosecuting antitrust class actions and other complex litigation.

39.     **Lieff Cabraser Heimann & Bernstein, LLP ("LCHB")** – LCHB is one of the nation's largest, oldest, and most successful antitrust class action firms, having recovered billions of dollars for consumers and workers in dozens of groundbreaking and complex class actions over the last several decades. LCHB has been lead or co-lead class counsel in nearly all successful no-poach antitrust class actions and, as a result, is widely recognized as a leader in the field.

The first no-poach antitrust case, *In re High-Tech Employee Antitrust Litigation,* No. 11-cv-02509-LHK (N.D. Cal.), was filed in 2011 by LCHB on behalf of a broad class of skilled technology workers, alleging that Google, Apple, Intel, Adobe, Pixar, Lucasflim, and Intuit entered into no-poach agreements that restricted the recruiting and hiring of each other's workers. The resulting $435 million recovery is still the largest by a class of employees from private employers ever. The *Daily Journal* described the case as the "most significant antitrust employment case in recent history," noting that it has since been "widely recognized as a legal and public policy breakthrough."[2]

LCHB has applied the lessons from *High Tech* in numerous cases. For example, counsel from LCHB drew on this experience when they investigated and exposed a no-poach agreement between Duke University and the University of North Carolina, litigating the case through certification of a litigation class and arguing summary judgment, ultimately securing two

---

[2] *See* https://www.dailyjournal.com/articles/293003 (last visited July 26, 2022).

significant settlements totaling $73.5 million. *Seaman v. Duke Univ., et al.*, No. 15-cv-462 (M.D.N.C.); *Binotti v. Duke Univ.*, No. 20-cv-470 (M.D.N.C.). LCHB's other cases in this area include *In re Railway Industry Employee No-Poach Antitrust Litigation*, MDL No. 2850 (W.D. Pa.), where LCHB secured a $48.95 million settlement on behalf of a class of skilled railway workers and *In re Outpatient Medical Center Employee Antitrust Litigation*, No. 21-cv-305 (N.D. Ill.), where LCHB (along with other co-lead counsel) represents a proposed class of outpatient medical center employees in a class parallel litigation to the U.S. Department of Justice's criminal prosecutions of companies and individuals who participated in no-poach agreements.

40. **McCune Wright Arevalo, LLP ("MWA")** – With almost 30 attorneys nationwide, MWA has for decades successfully represented plaintiffs in antitrust, product liability, consumer fraud, and other complex class action litigations. MWA and its attorneys have a lengthy track record of appointments to lead and co-lead class counsel positions along with other leadership roles in MDLs, consolidated actions, and complex class litigations. Examples include:

- *In re: Crop Inputs Antitrust Litigation*, MDL Case No. 2993 (E.D. Mo.) (Plaintiffs' Liaison Counsel)
- *In re: Hyundai & Kia Fuel Economy Litigation*, MDL Case No. 2424 (C.D. Cal.) (Plaintiffs' Co-Lead Class Counsel)
- *In re: TD Bank, N.A. Debit Card Overdraft Fee Litigation*, MDL Case No. 2613 (Dist. S. Car.) (Plaintiffs' Co-Lead Class Counsel)
- *Wellington et al. v. Empower Federal Credit Union et al.*, No. 5:20-cv-1367 (N.D.N.Y.) (Plaintiffs' Co-Lead Class Counsel)
- *Arrington, et al. v. Burger King Worldwide, Inc. et al.*, No.18-cv-24128 (S.D. Fla.) (Co-Lead Interim Class Counsel in no-poaching antitrust case)
- *In re: Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, & Products Liability Litigation*, MDL Case No. 2151 (C.D. Cal.) (Plaintiffs' Exec. Committee)
- *In re: Ford Fusion and C-Max Fuel Economy Litigation*, MDL Case No. 2450 (S.D.N.Y.) (Plaintiffs' Exec. Committee)

- *In re: AIG Workers Compensation Ins. Policyholder Litigation*, MDL No. 2519 (N.D. Ill.) (Plaintiffs' Co-Lead Interim Class Counsel)
- *Tolmasoff v. General Motors, LLC*, Case No.: 2:16-cv-11747 (E.D. Mich.) (Plaintiffs' Co-Lead Interim Class Counsel)
- *Bang v. BMW of North America, LLC*, No.: 2:15-cv-6945 (D.N.J.) (Plaintiffs' Co-Lead Interim Class Counsel)
- *In re Toyota Hybrid Brake Litigation*, No. 4:20-cv-00127-ALM (E.D. Tex.) (Plaintiffs' Interim Lead Class Counsel)
- *In re Chevrolet Bolt EV Battery Litigation*, No. 2:20-cv-13256-TGB-CI (E.D. Mich.) (Plaintiffs' Steering Committee)

Members of the firm have been appointed class counsel in dozens of other state and federal class actions as well, and have served as trial or co-trial counsel in class cases tried to verdict. *See Gutierrez, et al. v. Wells Fargo Bank, N.A.*, No. 3:07-cv-05923 (N.D. Cal.) (bench verdict in excess of $200 million). In another complex matter, MWA acted as retained outside counsel to the attorney general in *State of Arizona, ex rel. Mark Brnovich, Attorney General v. Volkswagen AG, et al.*, No. CV 2006-005112 (Ariz. Super. Ct. Maricopa Cnty.) (state secured $40 million in civil penalties and restitution from Volkswagen relating to emissions scandal).

41. **Scott+Scott Attorneys at Law LLP** – Scott+Scott is an international plaintiffs' litigation law firm with over 85 attorneys in offices spanning from Berlin to San Diego, with its headquarters in Connecticut. The firm specializes in complex litigation, including an emphasis on antitrust class actions. Scott+Scott's antitrust lawyers have extensive knowledge of the relevant substantive and procedural law and have collectively spent decades developing an expertise in applying that knowledge to effectively and efficiently prosecute complex class actions. Scott+Scott's recent prominent successes include the following large antitrust class actions:

- *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No 13-cv-7789 (LGS) (S.D.N.Y.) ("*FX*"). Scott+Scott serves as co-lead counsel in an antitrust action that alleges major banks conspired to fix the price of foreign exchange. The firm has obtained final approval of settlements with 15 of

- the 16 defendants, totaling over $2.3 billion, and continues to litigate against the remaining defendant.
- *Alaska Electrical Pension Fund v. Bank of America, N.A.*, No. 14-cv-7126 (JMF) (S.D.N.Y.) ("*ISDAfix*"). Scott+Scott served as co-lead counsel in an antitrust class action that alleged 14 major banks and a broker conspired to manipulate the ISDAfix rate, a key benchmark interest rate for a broad range of interest rate derivatives and other financial instruments. The Court approved the $504.5 million class settlement on November 13, 2018.
- *Dahl v. Bain Capital Partners, LLC*, No. 07-cv-12388 (WGY) (D. Mass.) ("*Dahl*"). Scott+Scott served as co-lead counsel in an antitrust class action that alleged the nation's largest private equity firms colluded to restrain competition and suppress prices paid to shareholders of public companies in connection with leveraged buyouts. Although the DOJ declined to prosecute, the case recovered $590.5 million for the class.

Scott+Scott has a track record of success in cases of this scale. Renowned mediator, Kenneth R. Feinberg, concluded that the *FX* settlements "represent[] some of the finest lawyering toward a negotiated resolution that I have witnessed in my career" and that Scott+Scott were "superlative, sophisticated, and determined plaintiff's lawyers." *See FX*, ECF No. 925 at 2; *FX*, ECF No. 926 ¶ 29. The New York Supreme Court described Scott+Scott's representation of New York University concerning Bernie Madoff's Ponzi scheme as "superlative." *New York Univ. v. Ariel Fund Ltd.*, No. 603803/08, slip. op. at 9-10 (N.Y. Sup. Ct. Mar. 1, 2010).

42. **Lowey Dannenberg, P.C. ("Lowey")** – For over five decades, Lowey has successfully prosecuted complex class actions, including antirust class actions like this one, against some of the largest corporations in the world and achieved substantial recoveries on behalf of consumers. Judge Rakoff of the Southern District of New York recently praised "the high quality of [Lowey's] work, both in briefs and oral argument," and Lowey's achievement in "obtaining valuable recompense and forward-looking protections for its clients" in the face of opposition from adversaries of "caliber and vigor." *In re GSE Bonds Antitrust Litig.*, No. 19 Civ. 1704, 2020 WL 3250593, at *4 (S.D.N.Y. Jun. 16, 2020).

Indeed, Lowey has achieved over a billion dollars in recovery against large well-resourced defendants. *See, e.g.*, *Sullivan, et al. v. Barclays plc, et al.*, No. 13-cv-2811 (PKC) (S.D.N.Y.) (prosecution of international financial institutions responsible for setting the Euro Interbank Offered Rate, in which co-lead counsel has recovered more than $490 million in settlements); *Laydon v. Mizuho Bank, Ltd.*, No. 12-cv-03419 (S.D.N.Y.) (proposed class action alleging the intentional and systematic manipulation of LIBOR benchmarks by the world's major banks, in which co-lead counsel obtained final approval of settlements with certain banks totaling $236 million); *In re Cardizem CD Antitrust Litig.*, MDL No. 1278 (E.D. Mich.) (generic delay antitrust class action, resulting in affirmance of partial summary judgment and $80 million class settlement).

The strategies and insights Lowey has developed in these complex federal cases have informed and will continue to inform the strategy Lowey employs in zealously and adequately representing the Class in this case.

43. Plaintiff's Counsel have also committed the resources necessary to represent the Class and will continue to manage the case efficiently and diligently to obtain settlement approval and, if approved, to implement the Settlement. To date, Plaintiff's Counsel have spent over $600,000 in out-of-pocket costs and over 17,000 hours (at least $9 million in lodestar) litigating this case on behalf of Plaintiff and the proposed Class.

44. Plaintiff's Counsel will submit detailed firm resumes with their motion for attorneys' fees and costs.

45. Plaintiff's Counsel have worked cooperatively and effectively to litigate this case, including by: (i) investigating the underlying facts and researching and evaluating legal claims; (ii) opposing and prevailing on Defendants' motion to dismiss; (iii) retaining experts to develop a

methodology for measuring impact and damages; (iv) participating in multiple mediation sessions; (v) negotiating the proposed settlement and settlement papers; and (vi) drafting the preliminary approval motion.

### Attorneys' Fees

46. Plaintiff's Counsel will request no more than twenty-five percent (25%) of the Gross Settlement Fund in fees and costs.

### Exhibits

47. Attached as Exhibit A is a true and correct copy of the executed Settlement Agreement, and Exhibits 1 (Proposed Claim Form), 2 (Proposed Final Approval Order), 3 (Proposed Class Notice) and 4 (Proposed Preliminary Approval Order) to the Settlement Agreement.

\*   \*   \*

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 27th day of July, 2022, in San Francisco, California.

_____
Lin Y. Chan

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 27, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

_____
Lin Y. Chan