**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**In Re: Papa John's Employee and Franchisee Employee Antitrust Litigation**

**Case No. 3:18-cv-825-BJB**

* * * * *

## FINAL APPROVAL OPINION & ORDER

**A. This Litigation.** This class-action settlement began as an antitrust controversy concerning alleged agreements in which Papa John's franchisees agreed not to compete with one another for employees. They allegedly "colluded" with one another, as well as Papa John's corporate officers, through "agree[ments] to not solicit or hire each other's employees," which allegedly depressed wages and reduced worker mobility. Consolidated Amended Complaint (DN 54) ¶¶ 6–8, 10–11. A putative class of employees sued, alleging violations of the Sherman Act.

Soon after the complaint was filed, the judge then presiding adjudicated a motion to dismiss. His order compelled arbitration of the claim of one of the lead Plaintiffs, held that the remaining two lead Plaintiffs stated a claim under the Sherman Act, and declined to strike the complaint's class allegations. *See generally* Memorandum Opinion (DN 90). The parties next conducted extensive discovery: "more than 400,000 pages of documents[,] including over 18 million records of employee data, over 6.6 million applicant tracking records, and over 376 million point-of-sale records," along with "ten depositions" and lengthy expert evaluation. Motion for Final Approval (DN 286) at 9. Then the parties reached a conditional agreement, subject to judicial approval under FED. R. CIV. P. 23(e), to settle the claims of absent doughslappers within the would-be class. *See* DN 202.

The first bid for preliminary approval failed, with counsel ordered to file additional briefing on Rule 23's adequacy and typicality requirements, as well as the question (going to predominance) whether antitrust law's "rule of reason" or instead its "per se rule" applied. *See* Order Denying Preliminary Approval (DN 227) at 6, 8 ("Making the findings required by Rule 23 requires additional information.").

After the parties updated their submissions, *see* Amended Motion for Settlement (DN 239), the Court held a preliminary-approval hearing, *see* DN 245, and granted the second motion for preliminary approval, *see* DN 270. Certification was likely, but questions persisted about notice and a possible service award. *See*

Preliminary Approval Order (DN 270). The Court then held a final fairness hearing to evaluate the proposed settlement. *See* DN 293; FED. R. CIV. P. 23(e)(2).

The preliminary-approval order explained why the proposed settlement here likely satisfied the criteria for final approval of a classwide settlement. *See* DN 270 at 2–10. No new information that emerged during the final hearing cast doubt on that determination. So the Court confirmed certification despite a few lingering concerns.

**B. Legal Standard.** Federal Rule of Civil Procedure 23(e) supplies a process and standard for judicial review of "a class," such as this, that is "proposed to be certified for purposes of settlement." Because no class had been certified before the parties reached a settlement, and because that settlement aimed to resolve the claims of all members of the putative class, this provision requires the trial judge to assess (1) whether the claims are appropriate for classwide resolution under Rule 23(a) & (b)(3), and (2) whether that resolution is appropriate for absent class members who'd be bound by the judgment under Rule 23(e)(2).

The first concern tracks the procedural requirements underpinning all class litigation. A settlement "'class action'" fit for approval under Rule 23(e) must be "one qualified for certification under Rule 23(a) and (b)." *Anchem Products v. Windsor*, 521 U.S. 591, 621 (1997). To certify a class, judges must assure themselves that the class "satisf[ies] all four of the Rule 23(a) prerequisites—numerosity, commonality, typicality, and adequate representation." *Young v. Nationwide Mutual Insurance*, 693 F.3d 532, 537 (6th Cir. 2012). Additionally, because this is a class proposed under Rule 23(b)(3), the Court must find that "questions common to the class predominate over questions affecting only individual members," and that a class action is a superior way to resolve the controversy. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir. 2008). "A party seeking class certification must affirmatively demonstrate … compliance" with Rule 23 by "prov[ing] that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (emphasis in original). Only if the class is "qualified for certification" under Rule 23(a)–(b), *Anchem*, 521 U.S. at 621, may the court proceed to assess it under Rule 23(e). And in making that determination, judges pay "undiluted, even heightened, attention" to Rule 23's procedural requirements. That's because certification at the time of judgment is final in a way that interlocutory certification is not: "a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold." *Id.* at 620.

The second concern is more substantive—and unique to class settlements. Judges ordinarily needn't (and shouldn't) concern themselves with the details of arms-length dispute resolution. In class litigation, however, judges "cannot rely on

the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class." *In re Dry Max Pampers Litigation*, 724 F.3d 713, 718 (6th Cir. 2013). That's because "a settling defendant is concerned only with its total liability" and "not the manner in which that amount is *allocated* between the class representatives, class counsel, and unnamed class members." *Id.* at 717. "Because class actions are rife with potential conflicts of interest …, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004).

In service of this principle, judges must satisfy themselves that the proposed settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e). In the Sixth Circuit, that analysis turns on two overlapping sets of factors—one that comes from Rule 23(e) itself, the other from caselaw that developed before the Federal Rules provided its own list of "core concerns" for evaluating classwide settlements. *See Wayside Church v. Van Buren County*, No. 24-1598, 2025 WL 2829601, at *10 (6th Cir. Oct. 6, 2025) (discussing how 2018 amendment and Advisory Committee Note affected circuit practice under Rule 23(e)(2)). Under Rule 23(e)(2), courts consider whether the class representatives and counsel adequately represented the class, negotiated at arm's length, and provided "adequate" and "equitabl[e]" classwide relief. *See In re East Palestine Train Derailment*, 158 F.4th 704, 713 (6th Cir. 2025) (applying Rule 23(e)(2)). Prior Sixth Circuit caselaw, not yet overruled or even displaced, identifies seven related considerations: "(1) the risk of fraud or collusion, (2) the complexity, expense and likely duration of the litigation, (3) the amount of discovery engaged in by the parties, (4) the likelihood of success on the merits, (5) the opinions of class counsel and class representatives, (6) the reaction of absent class members, and (7) the public interest." *Does 1–2 v. Déjà Vu Services, Inc.*, 925 F.3d 886, 894–95 (6th Cir. 2019) (quotation marks omitted). "The burden of proving the fairness of the settlement is on the [settlement's] proponents." *Dry Max*, 724 F.3d at 719 (quoting 4 NEWBERG ON CLASS ACTIONS § 11:42 (4th ed. 2002)).

***Rule 23's requirements.*** In first rejecting the class, and then preliminarily approving it, the Court considered potential problems under two of the four Rule 23(a) class-certification factors (typicality and adequacy) and one of the two Rule 23(b)(3) factors (predominance). Based on the parties' supplemental filings, however, none of those concerns warranted a finding that final approval was unlikely, *see* Preliminary Approval Order at 10, and none warrants changing course now.

The typicality concern arose because, by the time the parties opted to settle, only one class representative remained: Ashley Page, who worked as a store manager in York, Pennsylvania, Consolidated Amended Complaint ¶ 17. *See* Preliminary Approval Order at 3. She pleaded the same basic theory as all class members: that

no-poach clauses represented "an unreasonable restraint of trade because competitors effectively agreed to suppress employees' wages." *Id.* Yet as a store manager, the Court worried that Page could've played some "role … in enforcing the no-poach agreements" at issue in the litigation. Order Denying Preliminary Approval at 5. A supplemental filing dispelled that worry by revealing that "franchise owners (rather than store managers like Page) enforced the no-poach agreements, which applied to managers and non-managers alike." Preliminary Approval Order at 6. Page (like approximately half the class), moreover, wasn't subject to an arbitration agreement. *Id.* at 4. That's why the other class representative was no longer in this case: the Defendants successfully moved to compel arbitration of her claim. *See* Memorandum Opinion at 5–9. Given the potential variance in the value of the arbitrable and litigable claims, the class might've been better served by dividing into subclasses. *See* Preliminary Approval Order at 7. But that doesn't defeat typicality, because "the arbitration 'defense' is a procedural one unrelated to the underlying claim." *Id.* at 5 (citing *Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 884 (6th Cir. 1997)).

This dynamic likewise poses little reason (at least in this posture) to worry about adequacy. True, Page's incentives diverge in some respects from other class members': her claim is more valuable without an arbitration agreement. Yet as explained in the preliminary approval order, the Sixth Circuit "presume[s] a level of good faith from class representative and counsel." *Id.* at 7 (citing *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 563 (6th Cir. 2007)). And no "additional or contrary evidence or argument" has undermined that presumption since preliminary approval. *Id.* at 8; *see UAW v. General Motors Corp.*, 497 F.3d 615, 628 (6th Cir. 2007) (demanding "evidence of improper incentives" to rebut "the presumption that the class representatives and counsel handled their responsibilities with the independent vigor that the adversarial process demands"). Quite the opposite. The class has overwhelmingly embraced the settlement—managers and non-managers alike. While one might speculate whether Page optimally represented class members subject to arbitration agreements given the imperfect alignment of incentives, Page is apparently those class members' only chance at recovery. Without a settlement, class members "would recover nothing because classwide arbitration is apparently unavailable and individual arbitrations are presumably uneconomic to pursue." Preliminary Approval Order at 6 (quotation marks omitted).[1]

Last, no new developments raise questions about predominance. As explained in the Preliminary Approval Order (at 8–10), the Plaintiffs offered good reason—in

---

[1] Nothing suggests that, at this late date, the class members without arbitration agreements could've secured a better classwide settlement through a new lawsuit filed by a new class representative.

amended filings, at least—to believe that the common questions of substantive antitrust law, injury, and damages would predominate the litigation. To be clear, this doesn't mean that the Plaintiffs are or are likely right on those points—just that those points would've likely demanded considerable attention should the parties have proceeded to litigate rather than settle these claims.

***Objectors.*** Judges evaluating proposed settlements must recognize "the rights of the class members to voice their objections." *UAW*, 497 F.3d at 629–30 (cleaned up) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *In re General Tire & Rubber Co. Securities Litigation*, 726 F.2d 1075, 1086 (6th Cir. 1984)); *see* FED. R. CIV. P. 23(e)(5)(A) ("Any class member may object to the proposal if it requires court approval under this subdivision (e)."). Objections, in turn, bear upon judges' evaluation of the *Déjà Vu* factors. *See UAW*, 497 F.3d at 631.[2] In this case, a technical glitch prevented counsel from identifying every objector until soon before the final approval hearing. At that point, the Plaintiffs' supplemental submission (DN 292) disclosed 14 objectors out of a class comprising more than half a million. Upon review, however, none of their objections cast doubt on the appropriateness or fairness of the settlement.

Some complained that they didn't understand the settlement or that they wanted more money. *See* Table of Objections (DN 292) at 19 ("I … wish to receive 1 million [A]merican dollars"). Others complained of unrelated misconduct they allegedly experienced while working at Papa John's. *See id.* ("I file[d] a HR complaint against Papa John … and they fire[d] me during the investigation"). And a few apparently groused about the concept of class litigation. *See id.* ("This Class Action suit is Bullshit and just a money grab for attorneys;" "I resent being dragged into some shyster lawyer's idea of a get-rich-quick scheme. Now I have to waste my time and energy filling out stupid forms like this to prevent my good name from being dragged through the mud for problems I don't have and complaints I never made.").

Only one objector raised relevant, substantive concerns: that the $5 million fund was "grossly inadequate," that too much of the fund went toward fees and costs, that the release was overbroad, and that the settlement could've reflected collusion. Wade Wilkerson Objection (DN 292-1). The latter two concerns are meritless, however. Courts presume that settlements proceed from adversarial negotiation, not collusion, *see, e.g.*, *UAW*, 497 F.3d at 628, and nothing suggests otherwise here. "To

[2] Although "class members have a right to participate in the [final fairness] hearing," "a district court has wide latitude" to set the scope and manner of objection. *UAW*, 497 F.3d at 635. "It 'may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision' and need not endow objecting class members with 'the entire panoply of protections afforded by a full-blown trial on the merits.'" *Id.* (quoting *Tennessee Association of Health Maintenance Organizations v. Grier,* 262 F.3d 559, 567 (6th Cir. 2001)).

allow the objectors to disrupt the settlement on the basis of nothing more than their unsupported suppositions would completely thwart the settlement process." *Geier v. Alexander*, 801 F.2d 799, 809 (6th Cir. 1986). Meanwhile, the release covers only claims "that … relate to the facts, acts, transactions, occurrences, events, or omissions alleged in" this lawsuit—that is, the implementation and enforcement of the nonsolicitation provisions complained of by the Plaintiffs. Settlement Agreement (DN 202-2) ¶ 12.1. And for the reasons explained below, both the size of the settlement fund and the proportion allocated toward costs are reasonable—if only just.

***Settlement terms.*** Two features of the settlement raised concerns, largely independent of any objection, regarding whether the classwide settlement is "fair, reasonable, and adequate" under Rule 23(e)(2). *See Déjà Vu*, 925 F.3d at 894–95 (citing *UAW*, 497 F.3d at 631).

First, the settlement reflects a steep discount rate. The Plaintiffs' uncontested expert report estimated $195 million in damages across the class. DN 253-8 ¶ 20. The $5 million settlement thus discounts the Plaintiffs' claims by more than 95%. To be sure, this complex case involved significant litigation and recovery risks. No court had tested the Plaintiffs' no-poach wage-suppression theory when they filed, and the theory raised difficult and novel questions of antitrust law. *See, e.g.*, Order Denying Preliminary Approval at 6–7 (questioning "[t]he anticompetitive effect of no-poach restraints" between franchisees of the same restaurant brand). On the other hand, between filing and preliminary approval, the Seventh Circuit issued a pathmarking decision tracing, at least in part, the Plaintiffs' theory of the case. *See Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 702 (7th Cir. 2023) (Easterbrook, J.). That hardly guaranteed the Plaintiffs' success here, of course. But their theory is far less novel today than when they filed. Likewise, although proceeding to trial would doubtless carry cost and risk, it surely wouldn't entail *nine figures* of cost and risk. Why, then, did the parties agree to a $190 million discount on a $195 million claim? *Cf. Dry Max*, 724 F.3d at 718 ("in class-action settlements the district court cannot rely on the adversarial process to protect the interests of the persons most affected by the litigation—namely, the class").

As the lawyers are quick to note, this settlement also encompasses noneconomic relief. Motion for Final Approval at 21–22. In addition to (partially) compensating class members for any past wage suppression, the consent-decree aspect of the settlement offers prospective relief as well. Papa John's International (and Papa John's USA, Inc.) must forbid "no-poach or no-hire provision[s] in any new Franchise Agreement for … five … years" and email "all of their franchisees" a "notice that … reiterat[es] their commitment." Settlement Agreement ¶¶ 5.1, 5.2. Although

time limited (and not obviously useful to many class members[3]) this provision extends the settlement beyond purely monetary relief. And the proposed consent decree subjects Papa John's executives to "antitrust compliance training." ¶ 5.1. Whether this abbreviated (and apparently hortatory) training affects decisionmakers today and provides relief beyond the corporate pledge not to enter into such agreements for five years is anyone's guess; whether it helps a former Papa John's employee who clocked out a decade ago is clearer, but hardly compensatory. *See* Proposed Antitrust Compliance Training (DN 298-1) at 2 ("**DISCLAIMER**: The guidance contained in this training goes beyond what is strictly required by the laws. Its purpose is to help you avoid even the appearance of any antitrust legal issues and risks."). Perhaps counsel is right that noncompensatory measures like these nevertheless "ha[ve] value to society as both 'deterrents to unlawful behavior … and as private law enforcement regimes that free public sector resources.'" Motion for Final Approval at 21–22 (quoting *Gascho v. Global Fitness Holdings*, 822 F.3d 269, 287 (6th Cir. 2016)). The primary aim of class litigation, however, is redress for the private interests of the *class*—not an abstracted vision of the public interest. *See, e.g.*, *Dry Max*, 724 F.3d at 720 ("The fairness of the settlement must be evaluated primarily based on how it *compensates class members*—not on whether it provides relief to other people.") (cleaned up) (quoting *Synfuel Technologies v. DHL Express*, 463 F.3d 646, 654 (7th Cir. 2006)); *Mirfasihi*, 356 F.3d at 784–85 (similar); *cf.* Redish, et al., *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative and Empirical Analysis*, 62 FLA. L. REV. 617, 641–42 (2010) (critiquing settlements that "transfor[m] what begins as an adversary bilateral dispute … into a less-than-fully-adversary trilateral process," forcing "the court [to] presid[e] over the administrative redistribution of wealth for social good").

Still, although the agreement reflects a substantial discount, it's not necessarily an unreasonable one. Trial judges must be "careful not to substitute their own judgment for that of the settling parties." 4 NEWBERG & RUBENSTEIN ON CLASS ACTIONS § 13.46 (6th ed., Dec. 2025). Members of every class rationally prefer greater

---

[3] As certified for settlement, the class consists of:

> All individuals who were employed at a Papa John's branded restaurant located in the United States, whether owned by Defendants or a Papa John's franchisee, at any time between December 18, 2014[,] and December 31, 2021[,] and who received more than $200 in compensation during that time period.

Preliminary Approval Order at 11. Some of the class members (who number about 517,000) presumably still work for Papa John's franchisees. But surely not all, given that the class period ended nearly five years ago—and perhaps not even most, given the transience of the restaurant workforce. Whoever no longer works at Papa John's (and doesn't resume within the next five years) derives no clear benefit from the prospective remedy.

rewards to smaller ones, and courts generally trust them to pursue that interest with zeal. And the Sixth Circuit "favors settlement of meritorious class actions." *Train Derailment*, 158 F.4th at 713 (citing *Fidel v. Farley*, 534 F.3d 508, 513–14 (6th Cir. 2008); *UAW*, 497 F.3d at 632).

In this situation, a small settlement was a reasonable—if not necessarily the only reasonable—response to meaningful risks. *See In re Polyurethane Foam Antitrust Litigation*, 168 F. Supp. 3d 985, 1001 (N.D. Ohio 2016) ("The possibility that the settlement could have been better does not mean the settlement presented was not fair, reasonable or adequate.") (quotation marks omitted). "[L]ikelihood of success on the merits"—"the most important factor" in measuring reasonableness—is far from certain. *Train Derailment*, 158 F.4th at 713. The Plaintiffs' theory is more plausible today than back in 2018, but whether the Sixth Circuit would endorse it remains to be seen. The enormous amount of discovery and the factual and legal complexities of the case would require a long, costly trial. And as explained, settlement is the only apparent path to recovery for about half of the class thanks to their arbitration agreements. For them, a discounted recovery is the alternative to no recovery at all. This settlement thus ensures that everyone gets something (if not much) while also providing meaningful forward-looking protection. That presumably explains why only 14 of half a million class members have objected and only 34 have opted out. And given all this, the balance of the *Déjà Vu* factors clearly cut in favor of approval despite the settlement's small size.

***Fees and costs.*** Class members aren't the only group getting a haircut under this deal, either. Their experienced class-action lawyers, too, will apparently lose millions on this lawsuit.

The agreement sets aside $1.25 million for fees and costs. ¶ 10.1. The lawyers ask for $357,778.81 in fees. Motion for Attorneys' Fees & Expenses (DN 283) at 7. That's a small fraction of the lodestar value they propose, which nears $13 million. *Id.*; Declaration of Christian Levis (DN 283-1) ¶ 45. But the Plaintiffs also ask for $892,221.19 in costs, most of which owes to experts and discovery—including "research" and "doc review." Transcript of Final Approval Hearing (DN 296) at 10:14–19; *see* Fee Motion at 7–8; Levis Decl. ¶ 51. Money is fungible, of course, and nothing of consequence to the class turns upon these lawyers' allocation of their share between fees and costs as they see fit; "the reduction in recovery for the class members [is] the same whether you call it fees or costs." Hearing Tr. at 9:24–25.

But this allocation between fees and costs is unusual to say the least. In other contexts, "costs" generally refers to taxable *court* costs like reporters, interpreters, and so on. *See, e.g.*, *West Virginia University Hospitals v. Casey*, 499 U.S. 83, 86 (1991) (discussing 28 U.S.C. § 1920). In the class-settlement context, by contrast, courts may award otherwise *non*-taxable costs—typically understood as "all

reasonable out-of-pocket litigation expenses"—agreed upon by the litigants. *See, e.g.*, *In re Cardizem CD Antitrust Litigation*, 218 F.R.D. 508, 535 (E.D. Mich. 2003).

Even for such class actions, however, fees usually dwarf costs. *See, e.g.*, Eisenberg, et al., *Attorneys' Fees in Class Actions: 2009–2013*, 92 N.Y.U. L. REV. 937, 963 (2017). In part, that's because lawyer labor like research and doc review usually appears on the fees side of the ledger. So, often, do associated bills. *See, e.g.*, *Smith v. Master Service Corp.*, 592 F. App'x 363, 367–68 (6th Cir. 2014) ("Sixth Circuit law is unsettled regarding whether costs for electronic legal research are properly awarded [in civil-rights litigation] or whether these costs should be considered part of the overhead included in the attorney's hourly fee."). The more items are categorized as costs, of course, the lower the "fee" recovery (and thus the lodestar multiplier) will appear, without any actual reduction in the amount channeled away from class members. *See Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 624 (6th Cir. 2020) ("The lodestar method attempts to approximate the work done: the court multiplies the number of hours reasonably worked on the case by a reasonable hourly fee").

This sort of Enron accounting might raise eyebrows in other contexts where legal rules or collusion concerns motivate a stricter approach to cost allocation or taxation. But it needn't scuttle the settlement here. These particular expenses were privately bargained instead of judicially imposed. And nothing prohibits the class counsel, class representatives, and Papa John's from accounting for them as part of the agreed resolution and recovery. They are subsumed within, rather than added to, the Plaintiffs' total recovery—and still subject to judicial review for their fairness to absent class members. And the lodestar method, with its susceptibility to mathematical gerrymandering, isn't the only means of measuring the fairness of that recovery. The "percentage-of-the-fund" method remains available and, in situations like this, more accurately and reliably gauges the reasonableness of a proposed fee award. *See Gascho*, 822 F.3d at 280 ("District courts have the discretion to select the particular method of calculation, but must articulate the reasons for adopting a particular methodology and the factors considered in arriving at the fee.") (quotation marks omitted).

As a percentage of the fund, this 25% award is eminently reasonable. Courts within the Sixth Circuit have repeatedly accepted awards ranging from 20 to 30 percent. *See, e.g.*, *Rawlings v. Prudential-Bache Properties,* 9 F.3d 513, 515 (6th Cir. 1993) (25%); *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (30%) (vacating on other grounds); *Whitlock v. FSL Management,* No. 3:10-cv-562, 2015 WL 9413142, at *8 (W.D. Ky. Dec. 22, 2015), *aff'd*, 843 F.3d 1084 (6th Cir. 2016) (24%). Notwithstanding the small absolute size of this award, its proportions make sense. This eight-year-old case involved more work than the typical class settlement, victory was far from assured, the lawyers who undertook the venture rightly command

strong rates, they bore the risk of contingent compensation, and they litigated well. *See Ramey v. Cincinnati Enquirer*, 508 F.2d 1188, 1196 (6th Cir. 1974) (encouraging courts to consider not just the value of the benefit rendered to the class but also the difficulty of the case, the hourly market value of the lawyers' services, the lawyers' skill and reputation, whether the lawyers worked on contingency, and the social value of their work litigating class actions); *accord Moulton*, 581 F.3d at 352; *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)). If anything, this fee award is modest. Because the lawyers have asked only for 25% of the fund, however, that is what they will get—and they're free to spend that 25% by paying their bills before their bonuses.

***Service award.*** The settlement also provides for a $5,000 service award to Ashley Page, the last standing class representative. The Sixth Circuit has recognized that service awards can be "efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003). In their motion for final approval, the Plaintiffs explained that Page was not a figurehead but an active participant in the litigation: "she responded to interrogatories, produced documents, traveled to prepare and sit for a deposition lasting approximately seven hours (at the cost of missed work), reviewed all pleadings, and devoted approximately 100 hours to the case." Motion at 29. And although she will recover more than her peers, that well-earned compensation doesn't leave the other Plaintiffs hanging. In situations where representatives earn large payouts for little or no work, judges rightly fear self-dealing: "having been promised the award, the class representatives ha[ve] no interest in vigorously prosecuting the interests of unnamed class members." *Dry Max*, 724 F.3d at 722 (quotation marks omitted). In this case, however, the prospect of an award materialized only after Page had dedicated significant resources to litigating on behalf of her peers. Nothing about this settlement suggests a sellout on the part of Page. On the contrary, absent her early efforts the case quite likely would not have gone forward to reach a settlement benefiting the whole class to the same degree. So the Court has no reason to suspect that this unopposed award undermines the earnestness of her representation.

## ORDER

The Court accordingly finds that classwide resolution is appropriate under Federal Rule 23(a) & (b)(3), and that this settlement is "fair, reasonable, and adequate" under Rule 23(e). Every one of the *Déjà Vu* factors supports this resolution—although some surely weigh more heavily than others. Counsel fought long and hard to advance a novel theory in an important area of the law, and this settlement avoids the costs and risks of continuing this eight-year saga while providing meaningful (if not immense) benefit to the class. The Court therefore grants the motion for final approval of the class action settlement (DN 286), grants

the motion for attorney's fees (DN 283), and denies all other pending motions as moot. This is a final order.

Benjamin Beaton, District Judge
United States District Court

August 14, 2026